ANTHONY ESPOSITO, Appellant and Cross-Appellee, v. THE INDUSTRIAL COMMISSION *et al.* (Metropolitan Sanitary District of Greater Chicago, Appellee and Cross-Appellant).

First District (Industrial Commission Division)   No. 1—88—0966WC

Opinion filed July 21, 1989.

Gierach, Schussler & Walsh, Ltd., of Oak Lawn (James E. Gierach, of counsel), for appellant.

Allen S. Lavin, of Chicago (James B. Murray and Maureen K. Whelan, of counsel), for appellee Metropolitan Sanitary District of Greater Chicago.

JUSTICE WOODWARD delivered the opinion of the court:

Claimant, Anthony Esposito, filed an application for adjustment of claim under the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1979, ch. 48, par. 138.1 *et seq.*) for back injuries allegedly sustained in the course of his employment with respondent, Metropolitan Sanitary District. An arbitrator awarded claimant temporary total disability (TTD) for a period of 132⁴/₇ weeks and permanent total disability benefits under section 8(f) of the Act.

Following a hearing on review, the Industrial Commission (Commission) reduced the TTD award to 5⁸/₇ weeks and found that claimant was entitled to permanent partial disability as provided in section 8(d)1 of the Act, rather than permanent disability. The circuit court of Cook County reinstated the award of 132⁴/₇ weeks of TTD and con-

firmed the Commission's award of permanent partial disability. This appeal followed.

Claimant argues on appeal that the Commission's reduction of his TTD benefits and the award of permanent partial disability rather than permanent total disability were contrary to the manifest weight of the evidence. Respondent cross-appeals, contending that the circuit court's reinstatement of 1324/7 weeks of TTD was against the manifest weight of the evidence.

The evidence is largely undisputed. Claimant had been employed by respondent as a provisional sheet metal worker since 1976. In 1981, while still employed by respondent, claimant ran for and was elected to a four-year term as the highway commissioner of Worth Township, Cook County. In 1985, he was reelected to another four-year term as highway commissioner.

On March 1, 1982, claimant was standing on a ladder, lifting part of a metal roof, when he felt a "pop" in his back and then pain in his back and down both legs. At the time of his accident, claimant was in good health and had not experienced any problems with his back or legs.

After his accident, the claimant went home, took a hot bath, took his wife's pain pills, and used a heating pad. The next morning he reported to the respondent's nurse's office; he was taken directly to the Clearing Medical Center by respondent's police car. Claimant was treated there with Motrin, various pain pills, and diathermy. He noticed his left foot was numb, and he had pain in both legs and his back. After five or six treatments, which did not result in a release for work, he went on March 8, 1982, to the District Medical Center. Soon thereafter, respondent gave him permission to see an orthopedic physician, Dr. James P. Elmes. Claimant continued to have back and leg pain and numbness in his left leg.

Dr. Elmes originally treated the claimant with injections into the back and hip, medication, physical therapy, traction, a shoe lift, a corset, and a TNS machine. Later ultrasound, bedrest, and other medications were prescribed by Dr. Elmes. In March and April 1982, the claimant experienced weakness in his left leg, and his left leg was collapsing.

On May 23, 1982, claimant was admitted to St. Francis Hospital for 19 days under the care of Dr. Elmes. He received treatment consisting primarily of traction and physiotherapy, and he underwent a myelogram procedure. The myelogram revealed a large defect at L5 on the left and L4 central.

Respondent requested that claimant be examined by Dr. Camacho.

Dr. Camacho and claimant discussed the Chymopapain injection, but claimant was not released for work. Claimant received permission from respondent to travel to Canada in August 1982 to see Dr. McCulloch concerning the experimental injection, but claimant was found to be an unsuitable candidate for the treatment.

On September 10, 1982, claimant was again hospitalized at St. Francis Hospital with incapacitating low back pain. On September 14, 1982, two discs located at L4 central and left and L5 central were surgically removed with neurolysis at L5 on the right. At the same time, a spinal fusion at L4-S1 was performed with bone taken from the left hip.

On discharge from the hospital, claimant noticed that he had constant pain in his back and both legs. The pain interfered with his ability to sleep. Following his first operation, claimant was again treated with physical therapy, traction, a TNS unit, ultrasound, and spinal injections.

From October 1983 to January 1984, respondent had claimant attend the Parkview Orthopedic Back School, the Chicagoland Spine Clinic, and the Willow Springs Spinal Clinic for exercises and swimming therapy. Despite these measures, no improvement in claimant's condition was achieved.

In January 1984, the respondent sent the claimant to be examined and treated by Dr. James B. Boscardin, an orthopedic physician associated with the Parkview Orthopedic Clinic. Dr. Boscardin's written report to respondent confirmed that the claimant moves "very, very slowly and carefully," has positive straight leg raising on the left, and decreased extensor hallucius longus. Dr. Boscardin found radiculopathy on claimant's left side. Dr. Boscardin recommended further medical treatment, including a CT scan to rule out spinal stenosis. Dr. Boscardin further found after in-depth evaluation that "this gentleman probably will never return to strenuous activity *** he represents less than an ideal result following a laminectomy and spinal fusion. He is disabled at this time and unable to work. I feel he has made a total attempt at physical therapy and I do not feel that any further time or effort should be spent in these endeavors."

On July 21, 1984, a computer tomography of the lower spine revealed a mild bulging disc at L4-L5 and no central canal stenosis.

During this time period claimant continued to receive treatment from Dr. Elmes at four- to six-week intervals.

On August 30, 1984, Dr. Elmes wrote the following to Mr. Jack Singh, claims administrator and investigator for respondent:

"Anthony Esposito is unable to return to regular duty at this

time, should do sedentary type of work with no lifting, no excessive bending or twisting. Standing ability, to sit at least 5 minutes every half hour and if primarily sitting, to be able to stand and move around at least 5 minutes every half hour.

Please send any job classifications with specific duties involved for any light duty jobs available to see if Mr. Esposito's physical capacities would be adequate.

For specific information on his present condition, please refer to remarks on the enclosed report of his last visit on 8/30/84.''

The enclosed report stated claimant was "still disabled." Dr. Elmes never received any response to his letter.

On September 24, 1984, Dr. Elmes examined claimant and was of the opinion that claimant was not able to perform any work, including sedentary work. Thereafter, from October 4, 1984, to February 19, 1985, claimant was treated with additional physical therapy at St. Francis Hospital as an outpatient. On January 10, 1985, the physical therapist noted that "progress overall has been relatively unchanged and his mobility remains limited.''

Claimant was treated and examined regularly by Dr. Elmes through the close of proofs on review before the Commission. Claimant was treated for pain with multiple spinal injections of cortisone and pain killers on several occasions in 1984 and 1985.

At the April 19, 1985, arbitration hearing, claimant testified as to his current condition. He had constant pain in his back and both legs. This pain was aggravated by sitting more than one-half hour. Claimant experienced cramps in his back and legs; the pain extended to the left foot. He had swelling and numbness in the left foot. Pain prevented him from sleeping more than three or four hours at a time. He was then taking medication prescribed by Dr. Elmes, including Phenophen 3, Equinal 400, and Valium 10. His left leg continued to collapse without warning. He wore a back brace prescribed by Dr. Elmes all the time and used a cane to assist his walking.

On cross-examination, claimant testified that he was elected the highway commissioner of Worth Township in April 1981 and was reelected in April 1985. He was paid $15,120 per year during the first four-year term, and during his second four-year term, he received a fixed salary of $14,000 per year.

Claimant testified that his elective position required his attendance at two to three meetings per month. Since his accident, he had only been able to attend about one-half of the meetings.

Dr. Irwin T. Barnett, claimant's consulting physician, examined

him on January 16, 1984, January 21, 1985, and December 17, 1985, and wrote three reports, which were admitted into evidence. Dr. Barnett found numerous positive nerve root signs, limited mobility, muscle spasm, disc narrowing at the fourth and fifth disc spaces, and left leg weakness. Forward flexion was performed to 30 degrees where normal is 90 degrees; backward flexion was completely absent where normal is 35 degrees; left and right flexion was performed to 10 degrees, where 40 degrees is normal.

In his deposition taken May 15, 1985, which was admitted into evidence, Dr. Barnett opined that claimant's physical condition and pain would prevent him from performing any work, including sedentary work, on a regular basis. In Dr. Barnett's opinion, claimant's ability to perform up to six hours of work per week on township duties and an inability to perform any such work or duties in other weeks was consistent with his medical findings and the claimant's condition. Dr. Barnett described claimant as having a failed surgical back and being severely disabled. Dr. Barnett testified that claimant's condition was permanent.

Dr. Elmes' evidence deposition, taken May 31, 1985, was admitted into evidence. He testified that claimant could continue to perform township duties "as he apparently has been doing over the past two or three years." Dr. Elmes also stated that he did not know the specifics of claimant's duties as highway commissioner. In letters dated October 22, 1984, December 12, 1984, and January 14, 1985, Dr. Elmes advised respondent that claimant was unable to return to work.

Julie Bose, a certified rehabilitation counselor, whose evidence deposition was admitted at arbitration, administered a battery of tests to claimant on March 25, 1985. She determined that claimant was functionally illiterate, and performed at a middle grade-school level in reading, spelling, and arithmetic. Based on her training, experience, observations of claimant, review of his medical records, test scores, grades, work history, and the length of time the claimant had been out of the labor market, Ms. Bose was of the opinion that claimant would not be placeable in the competitive job market.

Bose further opined that claimant was not placeable in the competitive job market because employers look for stamina and dependability in an employee. She also noted that the pattern of the claimant's work as highway commissioner was dominated by erratic performance and hours and limited by his need to alternately sit, stand, and lie down.

In her opinion, an elected office is not a job in the competitive job

market. Bose stated, "An ordinance position is not a competitive labor market because competitive labor market by virtue of definition is that other people apply for the position and get it, get substantially gainful employment to do specific which is not the case in this ordained [*sic*] position that he holds. My consideration of his ability to perform his ordained position was considered in my opinion regarding his ability to work in the competitive labor market. Also, in the competitive job market, one gets paid for production." Finally, she testified that employability in the competitive job market commonly involves the ability to travel to work every day.

Joan P. Murphy, the Worth township clerk called by the respondent, testified as to her observations of the claimant at township meetings. On some occasions, he only stayed a few minutes and then would leave the meeting, which normally lasted an hour or less. He used a cane and limped when he walked. He squirmed from side to side as he sat and had to, alternately, sit and stand. Between March 1982 and January 1985, claimant missed 33 township meetings. In the early months of 1985, she observed that the claimant's face was drawn and that he appeared to be in extreme pain.

Murphy testified that projects undertaken by the highway department, of which claimant was commissioner, were primarily accomplished through the efforts of the township clerk, the township engineer, and the township attorney. She described the claimant's work as being done mostly on the telephone from his home.

The arbitrator found that claimant was permanently disabled under the Act and was entitled to 132⁴/₇ weeks of TTD.

At the March 4, 1986, review hearing before the Commission, claimant testified concerning his current activities and condition at that time. He stated that his condition had worsened since he had testified at the arbitration hearing conducted a year earlier. Dr. Elmes continued treating him during this period, and he received three or four spinal and hip injections for pain about every two months. His left leg continued to collapse. On May 1, 1985, the collapse of his left leg resulted in an emergency room examination at St. Francis Hospital. His body trembled if he sat for any length of time; he experienced back pain radiating down both legs if he were on his feet any length of time. At night, he was up every couple of hours, unable to sleep due to pain. He continued to wear a corset all the time. Claimant continued to take prescribed medication, including Equanal 400's, Phenophen, three pain pills, and Valium. He also continued to do prescribed exercises.

Claimant further testified that he had continued to hold his

elected office as highway commissioner, having been reelected in April 1985 for a second four-year term. His total hours of work were down to four or five hours a week because of pain in his back and legs. Claimant's condition on review was identical to his condition at the time of arbitration, in the respect that pain would not permit him to perform any township work for weeks at a time. About half of his work continued to be carried out at his home.

On cross-examination, claimant testified that no time records are kept by the township concerning his work hours, because he is an elected official. He further testified that he gets paid the same amount by the township whether he performs any work or no work at all.

On December 18, 1985, respondent had claimant examined by Dr. James W. Ryan, an orthopedic surgeon, who wrote a report of his findings. The Commission received his report in evidence as an admission against interest. Dr. Ryan reported claimant was unable to work and further reported:

> "The examination reveals a multitude of positive nerve root signs, such as bilateral Nafzigger, Bowstrings, Laseque, Straight Leg Raising to 30 degrees bilaterally, and pain with flexion of the lumbar spine. There are also bizarre findings, such as decreased sensation to the pinwheel in the stocking distribution below the knee with decreased vibratory and light touch sensation of all dermatomes below the left knee. He has some weakness of the extensor hallucis longus on the left. The patient, in spite of some functional overlay, appears to have pathology. The symptoms and findings appear to be that of spinal stenosis. I would recommend a CT Scan and myelography. He cannot work in his present condition."

The evidence deposition of Dr. Ryan was received in evidence by the Commission. Based upon his examination of the claimant, Dr. Ryan found that claimant's fifth lumbar root was permanently damaged. He thought the claimant might have nerve compression, and he found tenderness in either sciatic notch where the sciatic nerve emerges from the pelvis at the level of L3-L4 in the middle line over the posterior spine of the pelvis on either side at L4-L5. X rays of the lumbar spine showed narrowing of the disc spaces at L3-L4 and L4-L5.

Dr. Ryan testified that the claimant has a significant low back problem, and based on his examination, he concluded that claimant was not able to work.

Dr. Ryan stated that he received a telephone call from Jack

Singh, respondent's claims investigator, shortly after he mailed his report of examination to Singh. Dr. Ryan was told by Singh that claimant was a highway commissioner and had a strictly sedentary job. Dr. Ryan could not recall any other description of duties provided by Singh in the telephone call, but he assumed that claimant was working at a place of business. Dr. Ryan modified his report after receiving Singh's telephone call by a supplemental letter, dated January 8, 1986, which stated, "In response to your inquiry on the above named patient, I feel that Mr. Esposito as a highway commissioner can perform his duties. However, he has permanent partial disability of which the percentage cannot be quantified at this time."

Dr. Ryan conceded on cross-examination that the interruption of claimant's sleep due to pain could influence claimant's ability to work in even a sedentary job. Dr. Ryan noted that claimant was taking Equinal 400, Valium 10 mg, and Phenophen No. 3, and testified that these drugs, particularly Valium, have side effects and that Phenophen is a Codein product. Dr. Ryan conceded that claimant's use of Valium could adversely affect his ability to work, including sedentary work. He further testified that the history of left leg collapse could be consistent with a back problem such as claimant exhibited. Dr. Ryan admitted that a history of leg collapses, the use of prescribed Valium, Phenophen, and Equinal, and the inability to sleep at night could possibly affect claimant's ability to get a job, even a sedentary one, but he would not absolutely rule out the possibility of such employment. However, he further testified that the chronic use of medication would tend to prevent claimant from being employed. He agreed that one might have trouble getting a sedentary job after 30 years of job experience as a sheet metal worker. Finally, Dr. Ryan confirmed that he modified his report solely on the basis of the telephone call from Singh.

The essence of Dr. Ryan's testimony concerning the ability of the claimant to perform light duties or to perform the duties of a highway commissioner is reflected in the following series of questions and answers, which occurred during his cross-examination:

"Q. So, basically, when you said that he was able to continue his highway commissioner job, what you are saying, basically, is if he is able to do that job, something, he should do that?

A. That's correct.

Q. And if that happens to be 6 hours a week, so be it. And if it's 2 hours a week, so be it?

A. Correct.

Q. And you were not saying Mr. Esposito could work 40

hours a week in industry at light—a light-duty job?

A. I would say that that's largely correct, that that consideration didn't even enter my mind. I didn't give it any thought. I assumed that he had a political job and I didn't know the extent of it. I know from friends that people with political jobs can do more than their own job. My own secretary here had a political job and handled both of them, so political jobs are political jobs, so I really don't know—."

Relying on the fact that claimant was maintaining his elective position, the Commission found that he was entitled only to temporary total disability for those weeks during which he was hospitalized and unable to return to his sheet metal work for respondent or to assume his duties as highway commissioner. The Commission further found that claimant was entitled to permanent partial disability rather than permanent and total disability.

■■ ■ We first address the issue of whether the Commission's decision to award claimant permanent partial disability was against the manifest weight of the evidence. We initially note that the determination of the extent or permanency of the employee's disability is a question of fact, and the Commission's decision will not be set aside unless it is against the manifest weight of the evidence. (*E.R. Moore Co. v. Industrial Comm'n* (1978), 71 Ill. 2d 353.) The claimant has the burden of proving by a preponderance of the evidence the extent and permanency of his injury. (*Continental Drilling Co. v. Industrial Comm'n* (1987), 155 Ill. App. 3d 1031.) Once the claimant has met this burden, the respondent must then show that some kind of competitive market work is regularly and continuously available to the claimant. *Ceco Corp. v. Industrial Comm'n* (1983), 95 Ill. 2d 278.

■■ Regarding the standard by which permanent and total disability is judged, our supreme court has stated:

"We have often held that an employee is totally and permanently disabled under the act when 'such employee is unable to make some contribution to the work force sufficient to justify the payment of wages.' [Citation.] However, a claimant is not required to demonstrate total incapacity or helplessness before a permanent total disability award may be granted. [Citations.] A person is totally disabled when he cannot perform any services except those that are so limited in quantity, dependability or quality that there is no reasonably stable market for them. [Citations.] Conversely, if an employee is qualified for and capable of obtaining gainful employment without seriously endangering his health or life, he is not entitled to total and perma-

nent disability compensation." *Interlake, Inc. v. Industrial Comm'n* (1981), 86 Ill. 2d 168, 176.

■ Initially, we observe that the evidence clearly supports claimant's assertion that he is permanently and totally disabled in regard to his work as a sheet metal worker and that he has no marketable talents. All physicians who have either examined or treated claimant indicate his continuing inability to work as a sheet metal worker. No physician has found claimant able to return to work. For example, as noted above, Dr. Ryan, following his December 18, 1985, examination of claimant, observed that claimant was unable to work. Dr. Ryan noted compelling objective evidence of the extent of claimant's lower back problems. Further, claimant's consulting physician, Dr. Barnett, described his back as a failed surgical back. Dr. Barnett stated that claimant's severely disabled condition was permanent.

■ As noted above, the Commission found that claimant was entitled to a permanent partial disability award rather than an award of full permanent disability because of claimant's elective position. Based upon the testimony of Dr. Elmes, the Commission found that claimant was tolerating his activities as highway commissioner "quite well" and that he should continue in this position. The Commission also focused upon Dr. Elmes' view that claimant could perform sedentary work that did not include lifting, excessive bending or twisting. Further, the Commission relied upon claimant's testimony that in his position as highway commissioner, claimant supervised six full-time employees, attended some township meetings, worked 6 to 10 hours a week in the township office, and performed work-related duties, including paperwork and radio work, at his home.

The manifest weight of the evidence contradicts the Commission's finding that claimant's elective position served to mitigate the compensation due him.

A close inspection of Dr. Elmes' complete testimony, upon which both respondent and the Commission heavily rely, demonstrates Dr. Elmes' unfamiliarity with claimant's performance as highway commissioner.

During Dr. Elmes' cross-examination by respondent, the following colloquy took place.

"Q. Doctor, if you had been aware during that time that Mr. Esposito was working as a full-time highway commissioner, isn't it true you would have permitted him to continue on as the highway commissioner for Worth Township?

A. Yes, apparently from what you have told me, he is tolerating this moderate amount of activity fairly well, and it was

non-physical and not aggravating to his back apparently.

Q. If you assume Mr. Esposito worked anywhere from approximately 6 to 10 hours a week making telephone calls, attending meetings, listening to the radio, making a few radio phone calls, sometimes going out to different civic affairs in the community, would you call that a sedentary job that Mr. Esposito could perform if, in fact, you knew that he was doing those activities during the past three years?

A. Yes, I feel he could continue in that capacity of that type of sedentary job."

In contrast to this testimony was Dr. Elmes' answer to the following question put to him by claimant's attorney:

"Q. I want you to assume that Mr. Esposito spends approximately six hours a week making telephone calls from his home, from his bed at home and attends periodic meetings of the Worth Township Board at which he will periodically come and make a report and then leave the meeting and that the total of all his activities, *** are probably six hours a week.

I would like to have you further assume that in some weeks Mr. Esposito's pain prevents him from performing any duties or work whatsoever on behalf of the township whether it is making a telephone call from home or not.

Based on that information and your training and experience and examination of Mr. Esposito, as well as your knowledge of his physical condition, do you have an opinion as to whether or not Mr. Esposito could be gainfully employed in the labor market performing those services?

A. I think if that is his ultimate capacity, no."

Dr. Elmes' unfamiliarity with the position and the way in which claimant performed his duties vitiate the weight of his testimony.

In determining the effect of this elected position upon the degree of claimant's disability, we must look at the substance of his duties as highway commissioner and the work actually performed by claimant. The evidence regarding claimant's performance as highway commissioner is found in the testimony of claimant, Julie Bose, and Joan Murphy.

As noted above, claimant testified to the following regarding his work as highway commissioner. Prior to the instant injury, he worked approximately 30 hours per week on township business. Following the accident, claimant worked six hours per week on township duties. There were some weeks during which he was not able to do any work due to his back condition. Much of his township business is performed

by telephone or radio rather than in person at the township office. He talks with the township secretary on the phone several times a week. In the busy season, depending on the weather, he talks to his lead man on the radio at most once or twice during the day.

On review, claimant testified that he had a radio at home but weeks went by without any calls. He talked to the township on the telephone from his home two or four times a week. Claimant met with the secretary a couple of times a week, usually at his home, to sign papers. He talked with his lead man once per week for a few minutes. In the year prior to the hearing on review, he received two emergency calls.

Claimant has a secretary who handles the highway commissioner's office work. The lead man handles the work out in the field. An attorney drafts the budget, and an engineer handles the engineering duties. The township clerk prepares legal notices and accepts the bids for the roadwork to be done. At the time of the review hearing, claimant was spending four to five hours a week on township business, and during some weeks, he was unable to work at all because of pain.

The testimony of Joan Murphy, the Worth Township clerk, reflects claimant's sporadic and uncertain performance as highway commissioner since his injury. Murphy identified the 33 township meetings that claimant missed from March 1982 to January 1985. Murphy witnessed claimant's behavior at township meetings and observed that he squirmed as he sat, alternated standing and sitting, limped when he walked, used a cane, stayed at some meetings only a few minutes, and on occasion, left meetings after delivering his report. Murphy thought that in early 1985, claimant appeared to be in extreme pain.

Julie Bose, a certified rehabilitation counselor, administered a battery of tests to claimant on March 25, 1985. She determined that he was functionally illiterate and was performing at a middle grade level in reading, spelling, and arithmetic. Based on claimant's medical records, test scores, work history, and the time that claimant was out of the labor force, she found him unable to compete in the competitive job market.

Bose also stated that claimant's lack of stamina and dependability made him unplaceable in the competitive job market. She noted that his work as highway commissioner was marked by erratic performance and limited hours, which constrained his need to alternately stand, sit, and lie down.

Bose testified that an elective office is *not a job in the competitive job market*. She stated that, by definition, the competitive job market

means that others can apply for jobs, which is not the case when one holds an elected position for a fixed term. Also, Bose stated that a job in the competitive employment differs from an elective position in that the former is paid for one's production. Finally, she stated that employability in a competitive job market commonly requires that services be performed away from home.

This evidence demonstrates that, following his injury, claimant performed minimal duties as highway commissioner. His back injury severely limited his capacity to carry out the duties of highway commissioner. In essence, other township officials and employees performed claimant's duties when he was physically unable to do so. He was not a "full-time employee," as characterized by respondent, but rather one who was, at best, a marginal, part-time official of Worth Township.

Claimant met his burden of demonstrating that, although he is not altogether incapacitated for work, he is so handicapped as to be unemployable in any known branch of the labor market. *Ceco Corp.*, 95 Ill. 2d at 286-87.

As noted above, when a claimant has met this burden, the employer must come forward with evidence to show not only that the claimant is capable of engaging in some kind of regular and continuous employment but that such employment is reasonably available. *E.R. Moore Co.*, 71 Ill. 2d 353.

We find that respondent did not meet its burden of showing that some kind of employment was regularly and continuously available to claimant. Also, the record reflects that claimant was not performing and could not perform services regularly for which there was a reasonably stable labor market.

Consequently, we reverse the judgment of the circuit court which confirmed the Commission's award of permanent partial disability, and we find that claimant is entitled to an award of permanent and total disability. It follows that we affirm the circuit court's finding that claimant was entitled to 132⁴/₇ weeks of temporary total disability.

Affirmed in part; reversed and remanded in part.

BARRY, P.J., and McNAMARA, McCULLOUGH, and LEWIS, JJ., concur.