**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (1st) 182719WC-U

Order filed January 17, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION
_____

| | | |
|---|---|---|
| DEBORAH FOGARTY, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois |
| Appellant, | ) | |
| | ) | |
| | ) | |
| v. | ) | Appeal No. 1-18-2719WC |
| | ) | Circuit No. 18-L-50079 |
| | ) | |
| THE ILLINOIS WORKERS' | ) | |
| COMPENSATION COMMISSION *et al.* | ) | |
| | ) | Honorable |
| (Davis Staffing & Financial Applications | ) | Michael Otto, |
| Corporation, Inc., Appellee). | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices Hoffman, Hudson, Cavanagh, and Barberis concurred in the judgment.
_____

**ORDER**

¶ 1    *Held*:   The Commission's finding that the claimant's current condition of ill-being of fibromyalgia and major depression did not arise out of and in the course of her employment with the employer was not against the manifest weight of the evidence. Additionally, the Commission's determinations regarding a permanency award, vocational rehabilitation, penalties, and attorney fees were not against the manifest weight of the evidence.

- 1 -

¶ 2        The claimant, Deborah Fogarty, filed a claim for compensation under the Illinois Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2006)), for injuries to her right hand and wrist when she tripped on a computer cord on June 1, 2006, while employed as an accountant by Davis Staffing and Financial Corporation, Inc., her employer. Following 11 days of hearings occurring between June 13, 2013, and June 25, 2015, Arbitrator Brian Cronin issued an arbitration decision dated December 5, 2016, finding that the claimant's current condition of ill-being, fibromyalgia and major depression, was causally related to the June 1, 2006, accident. The decision further awarded the claimant temporary total disability (TTD) benefits through November 11, 2010, and maintenance benefits from November 11, 2010, through the date of the final hearing, June 25, 2015. The arbitrator further awarded the claimant permanent total disability (PTD) benefits, finding that the claimant was unable to obtain meaningful employment due to fibromyalgia and major depression that were causally related to the wrist and hand injury resulting from the June 1, 2006, accident. The arbitrator denied the claimant's request for penalties and attorney fees pursuant to sections 16, 19(k), and 19(l) of the Act.

¶ 3        The employer and the claimant each sought review by the Illinois Workers' Compensation Commission (Commission). The claimant challenged the denial of her claim for penalties and attorney fees. The employer challenged the findings regarding causation, vocational benefits, and the nature and extent of the claimant's permanent injuries. The Commission modified the arbitrator's decision, finding that the claimant had failed to prove that her fibromyalgia and major depression were causally related to the June 1, 2006, work-place accident. The Commission further determined that, in regard to the injury to her right hand and wrist, the claimant had reached maximum medical improvement (MMI) on November 11, 2010, and that on that date she was entitled to a permanent partial disability (PPD) benefit equal to 45% of the loss of use of the right

- 2 -

thumb and 10% loss of use of the right hand. The Commission vacated the PTD award and the maintenance benefits. Finally, the Commission affirmed and adopted the arbitrator's determination denying penalties and attorney fees. The claimant then sough review before the circuit court of Cook County, which confirmed the decision of the Commission. The claimant appeals.

¶ 4                                                          BACKGROUND

¶ 5         In the claimant's application for adjustment of claim, filed on June 28, 2006, she reported an injury to her right hand when she tripped on a computer cord on June 1, 2006. The evidence established that the claimant had a Bachelor of Arts degree from Lewis University and a degree in accounting from the University of Illinois. She was a certified public accountant. The evidence further established that the claimant was previously an accounting manager for the CBS television station in Chicago. She was charged with theft of over $2 million from CBS, in a scheme involving false and duplicate billings of various venders. She pled guilty to felony theft by deception and money laundering in 2003. She was incarcerated from July 2003 through January 2006, and her husband, who also pled guilty, was incarcerated from July 2003 through February 2005.

¶ 6         The claimant testified that, on June 1, 2006, she tripped over a cord and had to suddenly grab onto the desk with her right hand. Her thumb started to swell and bruise. She worked the next couple of days and reported the accident to her supervisor on June 14, 2006. The claimant then sought treatment at Midwest Physician Centers on June 14, 2006. She complained of a constant throbbing pain in her hand. She followed up on June 26, 2006, with continued pain in her right hand. On June 30, 2006, she was examined by Dr. James Davis of Midwest Physicians. Dr. Davis's treatment notes indicate the claimant reported continued pain in the right had following a June 1, 2006, accident. He further noted that conservative care was appropriate, and no surgical

- 3 -

intervention was necessary. He advised the claimant to use her wrist normally and released her to work without restriction. The claimant did not return to work with the employer.

¶ 7        On October 2, 2006, the claimant sought treatment from Dr. Terry Light of Loyola University. His treatment notes indicated the claimant reported falling onto her extended right wrist in June 2006. She reported swelling and pain and that she continued to have pain with wrist movement and hand numbness at night. Dr. Light diagnosed possible mild right median nerve compression. The claimant began working for Waldo Corporation in October 2006 performing light accounting work and keyboarding. The claimant testified that Waldo accommodated her right thumb issues by providing her with an ergonomic keyboard. The claimant worked at Waldo until June 30, 2008, when Waldo closed.

¶ 8        On October 10, 2006, the claimant was examined at the request of the employer, pursuant to section 12 of the Act, by Dr. Paul Papierski, a board-certified orthopedist. The claimant reported continuous moderate to severe pain of the right thumb and hand. Dr. Papierski noted evidence of a triquetral avulsion fracture to her right wrist, likely related to the June 1, 2006, accident. He opined that her prognosis for recovery was excellent. He further opined that the claimant was able to work without restriction.

¶ 9        On August 20, 2007, the claimant fell from an escalator in a Metra station. According to the accident report generated by the Chicago fire department, the claimant had four lacerations on the right arm, right shoulder, right side of the face, and cheek. She slid down the escalator face first on her right side. She was transported to Northwestern Memorial Hospital where it was noted she had abrasions to the right side of the face, forehead, forearm, and hand. The claimant testified that she has no memory of injuring her right hand in the Metra fall.

¶ 10        The claimant worked for an accounting firm in Crestwood, Illinois for six weeks in July and August 2008. She testified that she quit that employment after undergoing an emergency hysterectomy on August 20, 2008.

¶ 11        On October 2, 2008, the claimant sought treatment from Dr. John Fernandez of Rush University Medical Center. She reported pain and numbness in her right hand that she attributed to the June 1, 2006, accident. Dr. Fernandez recommended right thumb basilar joint arthroplasty and right wrist carpal tunnel intervention. He recommended she return to work with a five-pound lifting restriction and minimal repetitive use of tools.

¶ 12        On November 14, 2008, the claimant underwent a right thumb surgery and right carpal tunnel release surgery performed by Dr. Fernandez, who prescribed post-surgical physical therapy. The record established that the claimant filed a claim for bilateral carpal tunnel syndrome against Waldo, alleging a date of accident of June 30, 2008. The claimant subsequently settled her claim against Waldo on April 14, 2011, for $39,114.

¶ 13        On February 13, 2009, physical therapy treatment notes reported the claimant continued to experience right wrist and hand pain.

¶ 14        On August 14, 2009, Dr. Fernandez performed a right thumb joint fusion. During a post-surgical visit on September 29, 2009, the claimant reported that her pain had decreased, and she was pleased. She had some stiffness along the fused joint of the thumb and some stiffness of the wrist. Her pain was 7 out of 10. Dr. Fernandez diagnosed right thumb joint stiffness with pain, right wrist stiffness, and left wrist carpal tunnel syndrome. He restricted work to one-handed capacity. The claimant continued physical therapy and continued to report right hand and wrist pain. On January 5, 2010, the claimant reported jamming her right thumb causing the tip of the thumb to be painful all day.

¶ 15    On July 20, 2010, the claimant was again examined by Dr. Fernandez. At this examination, the primary complaint was left hand pain. Dr. Fernandez noted that the claimant reported that the physical therapy was not helpful to the right hand. He restricted her work to light duty, with less than 10 pounds of force to both her right and left upper extremities. She was further limited to minimal repetitive use and no use of tools.

¶ 16    On August 27, 2010, Dr. Fernandez performed a left carpal tunnel release. The claimant had filed a claim for left carpal tunnel syndrome against Waldo.

¶ 17    On September 28, 2010, the claimant presented for a surgical follow up with Dr. Fernandez. His examination notes indicate that the claimant was using a wheelchair. She reported that she used a wheelchair most of the time and had difficulty getting around. She reported difficulty with daily tasks, such as dressing, feeding herself, and typing on a computer. Dr. Fernandez noted that further treatment for her carpal tunnel would not be beneficial. He opined that she was at MMI regarding her right and left carpal tunnel conditions. He opined that she could engage in light activities up to 10 pounds of use with frequent breaks particularly with more significant repetitive type of use through the wrist and hands.

¶ 18    On November 11, 2010, the claimant was again examined and treated by Dr. Fernandez. He noted her report of residual pain at the basilar joint site on the right thumb, with associated stiffness of the thumb relating to the prior fusion surgery, along with stiffness in the fused joint. She reported difficulty with light activities such as getting dressed, feeding herself, writing, and keyboarding. This was secondary to loss of motion, loss of strength, and associated pain. Dr. Fernandez opined that she was at MMI with regard to her right thumb. He restricted her to only very light use on the right side with less than five pounds of use with minimal repetition or use of tools. She was to have minimal exposure to typing, writing, or use of calculators and other manual

activities requiring the right hand. Dr. Fernandez expected similar restrictions on the left, but he noted that those restrictions were not related to the June 1, 2006, accident.

¶ 19    On March 2, 2011, the claimant treated for depression with Dr. Yolanda Solecki, a psychiatrist. The claimant reported that her symptoms have been present for a year or longer. She stated that it was related to her deteriorating health condition and a fall at work. She had two deaths in the family. She was being sued by her sisters over her mother's estate. She gained weight with the birth of her child and has been unable to lose the weight. Dr. Solecki diagnosed major depressive disorder, severe without psychotic features.

¶ 20    On August 26, 2011, Dr. Evaldas Radzevicius, a neurobehavioral psychiatrist, issued a letter noting that the claimant's psychiatric symptoms could be related to her work accident of June 1, 2006, noting that she had no history of psychiatric conditions, depression or anxiety, and no history of psychiatric medications prior to the June 1, 2006, accident. He opined, based on the appearance of psychiatric symptoms after the June 1, 2006, accident, that the major depression and anxiety were caused by her June 1, 2006, injury and related surgeries. He further opined that, as a result of her current psychiatric condition, the claimant was unable to function in any work setting for the foreseeable future.

¶ 21    On September 14, 2011, Dr. Majid Serushan, a board-certified rheumatologist, examined the claimant and issued a written report. He noted that the claimant reported diffuse pain all over her body including her hands, knuckles, wrists, shoulders, hips, knees, and neck, and complained of fatigue. He noted a history of depression beginning after the multiple surgeries and pain in the right hand. He diagnosed chronic fibromyalgia with possible depression. Dr. Serushan started the claimant on Lyrica, a common treatment for pain for those that suffer from fibromyalgia. He also prescribed Fentanyl, an opioid pain reliever, for her pain. Dr. Serusham authored a letter on

October 12, 2011, at the request of the claimant's attorney, in which he noted that the claimant reported she weighed 190 pounds prior to the June 2006 injury, but now weighed 250 pounds. The claimant attributed this weight gain to inactivity and changes in lifestyles following the June 2006 accident. In the letter, Dr. Serusham opined that the claimant's fibromyalgia "evolved" after her the June 2006 fall, which lead to multiple surgeries, which in turn caused her major depression. He further opined that her condition was permanent. He further opined that the claimant would not be able to hold any gainful employment with the disability in her hands along with all her aches and pains all over her body.

¶ 22    In his subsequent deposition, Dr. Serushan opined that the claimant's fibromyalgia was initiated or instigated by the June 1, 2006, accident. On cross-examination, Dr. Serushan stated that he was unaware of the claimant's August 2007 fall down the escalator at the Metra Station. He opined that the hysterectomy was not relevant to his diagnosis of fibromyalgia. He acknowledged that the claimant worked from October 17, 2006, through June 30, 2008, the date of the emergency hysterectomy. He asserted that he did not know why the claimant stopped working.

¶ 23    On November 18, 2011, Dr. Jeff Lucas, a board-certified vocational specialist, from Effective Rehabilitation Services, authored a report noting that the claimant's disability, pain, psychological issues, and mental status would impact her ability to complete a full day of employment. He noted that the claimant could not do an entry level job as this takes good use of both hands. It was his opinion that she would be unable to find any employer to accommodate her current disability, and that her current restrictions did not lend to any gainful employment. He further opined that there was no workplace in the labor market that could accommodate the

claimant's current condition. He noted that there were several employers who would hire felons, but the claimant's criminal background would limit her ability to find employment.

¶ 24     On January 23, 2012, the claimant was video-recorded walking with the assistance of a cane. She walked with an altered gait. She and her husband went to the train station where her husband put her in a wheelchair and pushed her to the train. She was pushed in a wheelchair to and from her doctor's appointment. The surveillance tape was entered into evidence.

¶ 25     On February 1, 2012, the claimant was evaluated at the request of the employer by Dr. Ronald Ganellen, Ph.D., a neuropsychologist. Ganellen noted that the claimant performed all tasks with her left hand. He also noted that the claimant had managed all the demands of her employment at Waldo and the Crestwood accounting firm until her emergency hysterectomy even though she experienced pain in her right hand and limitations attributable to the June 2006 accident. Ganellen further opined that the claimant's mental and psychological decline could not be explained by the effects of the June 2006 injury to her right hand. He also observed that psychological tests showed that the claimant deliberately exaggerated her reports of problems in adjustment and limitations in functioning. He opined that she deliberately and consciously overstated the problems she currently experienced to convince others she was disabled. Ganellen agreed with a diagnosis of major depression, but he disagreed that it was linked to the June 2006 accident. He noted "strong objective evidence that [the claimant] was not providing an accurate, reliable history. Ganellen further opined that several factors occurring between 2006 and 2010 including the death of her mother and conflicts with her sister all contributed to the onset and persistence of a negative mood. He further opined that it was very difficult to accept the claimant's description of her symptoms and conditions at face value. He further opined that the claimant likely would have returned to

work as an accountant had she not had the emergency hysterectomy and that none of the psychological symptoms were observed or identified until after the hysterectomy.

¶ 26    On March 14, 2012, the claimant was examined at the request of the employer, pursuant to section 12 of the Act, by Dr. Michael Vender, a board-certified orthopedist with a specialty in hand surgery. The claimant indicated that her right hand was "dead." Dr. Vender opined that the claimant's presentation related to her right upper extremity would be considered non-physiologic in nature. He further opined that her reported symptoms were not based on a true objective pathology within the upper extremity. Instead her reports were consistent with behavioral abnormality and a significant psychiatric history. He observed that there were no objective findings to support the claimant's right hand was "dead." He opined that her fibromyalgia was unrelated to her thumb injury. He observed that fibromyalgia is not a reported symptom following hand surgery. He noted that results of the claimant's thumb surgery were very good and results such as hers would be expected to have very little residual complaints or disability. He noted that after the right thumb surgery, the claimant was released without any work restrictions or need for any more medical treatment. Based on these observations, he stated with a reasonable degree of medical certainty that the claimant's current inability to work was not based on any injury to the right upper extremity. He opined that she could work as an accountant without restrictions.

¶ 27    On March 14, 2012, the claimant was awarded Social Security disability (SSDI) benefits. Her attorney contacted Drs. Serushan and Lucas to write reports supporting her claim for SSDI. The claimant was found to be disabled for social security purposes since August 14, 2009, and received retroactive benefits to August 2009. The record shows she also received TTD from the employer from August 2009 through May 2010.

¶ 28      On February 7, 2013, Sharon Babat, an employment consultant for S&H Management Services, prepared a vocational report at the employer's request. Babat noted that the claimant had several relevant transferrable skills and could find employment in the local labor market. Babat did note, however, that the claimant's felony conviction for embezzling millions of dollars from a previous employer and her related felony conviction were barriers to her obtaining employment. Babat performed a labor market survey factoring Dr. Fernandez's restriction of five-pound maximum lifting with her right upper extremity and minimal use of tools. She opined that the claimant could secure employment paying between $8.25 per hour and $25.00 per hour with expectations of higher pay given her past work experience. On cross-examination, Babat acknowledged that her opinion did not consider Dr. Serushan's medical records or opinions regarding fibromyalgia. She maintained that her opinion did not rely heavily on medical opinions regarding the claimant's ability to work, noting that one doctor provided 5 to 10-pound restrictions, one doctor provided a 10-pound restriction, and one doctor provided no restriction at all.

¶ 29      The claimant testified that she has pain all over her body, significant fatigue, and sleep apnea. She cannot bear weight on her right hand and holds her cane with her left hand. She testified that she can "basically do nothing at all." She has not been able to handle her household, does not have a normal life, cries a lot, and is depressed. The claimant did not recall if she had anxiety or depression prior to June 1, 2006. She testified that she was not diagnosed with fibromyalgia prior to June 1, 2006.

¶ 30      The arbitrator found that the claimant established a causal connection between the June 1, 2006, accident and her current conditions of fibromyalgia and major depression. In reaching this conclusion, the arbitrator found the opinions of Drs. Serushan and Radzevicius to be more persuasive than Drs. Vender and Ganellen. Regarding the nature and extent of the claimant's

condition, the arbitrator concluded that the conditions of fibromyalgia and depression rendered the claimant unable to engage in gainful employment. Based upon his finding that these conditions were causally related to the claimant's June 1, 2006, accident, the arbitrator awarded PTD benefits beginning June 26, 2015. Regarding the claimant's request for penalties and attorney fees, the arbitrator determined that the employer reasonably relied upon the opinions of Dr. Vender when terminating benefits, and thus, did not act in an unreasonable or vexatious manner.

¶ 31 The Commission affirmed and adopted the arbitrator's conclusion that the claimant reached MMI relative to her right hand on November 10, 2010. The Commission rejected, however, the arbitrator's finding that the claimant's fibromyalgia and depression were causally related to her employment. The Commission noted that the claimant's "lack of credibility when coupled with the medical evidence" led to the conclusions that her fibromyalgia and depression were not causally related to the June 1, 2006, accident and that her right hand and thumb condition reached MMI on November 10, 2010.

¶ 32 The Commission made several references throughout its unanimous decision to the claimant's lack of credibility, starting with the observation that she pled guilty and was convicted of embezzling over $2 million from a prior employer. It described her testimony as "histrionics," "an apparent farce," "Wilderesque," "nothing more than a chimerical dream," akin to "opening a Fortune Cookie and looking inside for a prize," and "a ruse intended to effectuate an award of PTD." The Commission further noted Dr. Ganellen's observation that "there was strong objective evidence that [the claimant] was not providing and accurate, reliable history" and credited his opinion that she "deliberately exaggerated" her symptomology and "deliberately and consciously overstated" her current limitations. Finally, the Commission noted that the claimant's use of a

- 12 -

wheelchair was not based upon any objective medical necessity and was contradicted by surveillance video.

¶ 33    In addition to its findings regarding the claimant's credibility, the Commission also rejected the arbitrator's weighing of the medical opinion testimony. Specifically, the Commission was not persuaded by Dr. Serushan's opinion that the claimant's fibromyalgia and related depression were causally related to the June 1, 2006, accident. It noted that his opinion linking the claimant's current condition to the accident was undercut by: (1) indications that the claimant's depression predated the accident; (2) the claimant working at Waldo for a year and a half without any symptoms of fibromyalgia; (3) the occurrence of several events after the June 1, 2006, accident which were equally likely to trigger fibromyalgia and depression, including her fall at the Metra station, the death of her mother, her legal disputes with her sister, and her emergency hysterectomy; and (4) the general unreliability of the claimant's descriptions of her symptoms and condition. The Commission noted Dr. Serushan's opinion that the hysterectomy was not the cause of her fibromyalgia, however it also noted that he was not aware of the fall at the Metra station and he did not know why she stopped working on June 30, 2008.

¶ 34    The Commission gave greater weight to the opinion of Dr. Ganellen regarding the causal relationship between the June 1, 2006, accident and the claimant's current condition of ill-being. Dr. Ganellen noted that the claimant was fully employed and able to meet all physical demands immediately prior to her emergency hysterectomy. He also noted that psychological symptoms likewise began following the emergency hysterectomy. The Commission further noted that Dr. Ganellen "found strong evidence that [the claimant] was not providing an accurate, reliable history." The Commission also gave greater weight to Dr. Vender's opinion, based upon her

complete recovery and release to work without restrictions following the thumb surgery, that the subsequent fibromyalgia and depression were not casually related to the June 1, 2006, accident.

¶ 35    Regarding the condition of the claimant's right hand and thumb, the Commission agreed that the condition was causally related to the June 1, 2006, accident. The Commission further determined that the claimant reached MMI on November 11, 2010, as opined by Dr. Fernandez, her treating physician. The Commission then determined, based upon Dr. Vender's opinion that the claimant's condition had stabilized, and further treatment and accommodation was not warranted, that rehabilitation was not necessary, and a permanency award was warranted. The Commission noted the permanent limitations resulting from the right thumb joint fusion surgery and awarded 45% of the loss of use of the right thumb and an additional 10% loss of use of the right hand resulting from post-fracture impingement. The Commission also affirmed and adopted the arbitrator's denial of the claimant's request for penalties and attorney fees.

¶ 36    The claimant sought review before the circuit court of Cook County, which confirmed the decision of the Commission. The claimant then filed this appeal.

¶ 37                                    ANALYSIS

¶ 38    The claimant takes issue with the following findings made by the Commission: (1) the claimant's current conditions of fibromyalgia and major depression were not causally related to the June 1, 2006, accident; (2) the claimant was not entitled to a PTD award; (3) the claimant's TTD benefits ceased on November 11, 2010; (4) the claimant was not entitled to maintenance benefits; and (5) the claimant was not entitled to penalties and attorney fees.

¶ 39                          I. Fibromyalgia and Depression

¶ 40    The claimant's primary argument is that the Commission erred in finding that her current conditions of fibromyalgia and major depression were not causally related to the June 1, 2006,

- 14 -

accident. The claimant maintains that the accident was *a* causative factor that began a chain of occurrences leading from the accident to her condition of fibromyalgia and depression. She argues that her current condition is compensable since a work-related injury "need not be the sole causative factor, nor even the primary causative factor, as long as it was *a* causative factor in the resulting condition of ill-being." (Emphasis in original.) *Sisbro Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 205 (2003).

¶ 41        While the claimant is correct in noting that an industrial accident need only be *a* cause of her current condition of ill-being, whether a claimant's current condition is related in any way to an industrial accident is a factual question to be decided by the Commission. *Id.* Causation, including the existence of independent intervening causes, is a question of fact for the Commission, and its findings in that regard will not be reversed on appeal unless they are against the manifest weight of the evidence. *Dunteman v. Illinois Workers' Compensation Comm'n*, 2016 IL App (4th) 150543WC, ¶ 39. For a finding to be against the manifest weight of the evidence, an opposite conclusion should be clearly apparent. *Montgomery Elevator Co. v. Industrial Comm'n*, 244 Ill. App. 3d 563, 567 (1993). Moreover, a reviewing court will not disregard or reject permissible inferences drawn by the Commission. *Parro v. Industrial Comm'n*, 167 Ill. 2d 385, 396 (1995). Where medical opinion testimony regarding causation is in conflict, resolution of that conflict falls within the province of the Commission. *Caterpillar Tractor Co. v. Industrial Comm'n*, 92 Ill. 2d 30, 37 (1982). Further, it is well-settled that the Commission, not the arbitrator, determines the credibility of witnesses and assess the weight to be given to the evidence. *R.A. Cullinan & Sons v. Industrial Comm'n*, 216 Ill. App. 3d 1048, 1054 (1991).

¶ 42        In the instant matter, on the issue of whether the June 1, 2006, accident was *a* causative factor related to the claimant's fibromyalgia and depression, it cannot be said that the

Commission's finding in that regard was against the manifest weight of the evidence. Ultimately, the issue of causation came down to competing medical opinion testimony. While Dr. Serushan opined that the claimant's condition was causally related to the June 1, 2006, accident, the Commission gave less weight to his opinion based on several factors noted above. Moreover, Dr. Serushan's opinion as to causation rested heavily upon his observation that the claimant had no symptoms of fibromyalgia prior to the June 1, 2006, accident. The Commission rejected this analysis, pointing out that the claimant showed no symptoms of fibromyalgia until sometime after June 30, 2008, some two years after the 2006 accident. The Commission further noted that several incidents occurred after the 2006 accident that were more likely independent causes of the claimant's fibromyalgia and depression. Moreover, the Commission gave greater weight to the opinions of Drs. Vender and Ganellen that the claimant's fibromyalgia and depression were not causally related to the June 1, 2006, accident, and there is nothing in the record to establish that the weight given to the conflicting medical testimony was against the manifest weight of the evidence. Ultimately, the proposition that good health prior to an accident followed by the onset of a condition of ill-being is not a medical concept, but rather a method of proving causation that the Commission is entitled to accept or reject based upon the facts and inferences presented. *Waldorf Corp. v. Industrial Comm'n*, 303 Ill. App. 3d 477, 480 (1999). Here, there is nothing in the record to indicate that the Commission's rejection of this proposition was against the manifest weight of the evidence.

¶ 43                                 II. Permanency Award

¶ 44        The claimant next maintains that the Commission erred in finding that she was not entitled to a PTD award. The argument is based entirely upon the proposition that she had proven the causal connection between the June 1, 2006, accident and her subsequent fibromyalgia and depression.

Dr. Serushan, opined that the claimant's fibromyalgia led to her depression. He opined that the general physical pain due to fibromyalgia, combined with pain in both her hands, led to her depression and a need for pain management medication. According to Dr. Serushan, the pain medication was a major factor in rendering the claimant unable to engage in gainful employment. Dr. Radzevicius, the claimant's psychiatrist, opined that the claimant's psychiatric condition rendered her unable to work. Similarly, Dr. Lucas, the claimant's vocational expert, attributed her inability to perform any meaningful work to psychological and mental issues.

¶ 45        The determination of the nature or extent of a claimant's permanent injuries is a question of fact for the Commission to determine, and its decision will not be set aside unless it is against the manifest weight of the evidence. *Schoon v. Industrial Comm'n*, 259 Ill. App. 3d 587, 590 (1994). The claimant has the burden of proving the extent and permanency of her injury by a preponderance of the evidence. *Esposito v. Industrial Comm'n*, 186 Ill. App. 3d 728, 737 (1989). To establish permanent total disability, a claimant must produce medical evidence showing that he or she is totally disabled from work, or show by a preponderance of the evidence that, due to age, experience, training, or education, there is no stable labor market for the claimant's abilities. *Valley Mould & Iron Co. v. Industrial Comm'n*, 84 Ill. 2d 538, 546-47 (1981).

¶ 46        In the instant matter, the Commission determined that the claimant had failed to establish her entitlement to PTD benefits. Regarding the medical proof of PTD, the Commission found that, since the claimant failed to establish a causal connection between the June 1, 2006, accident and her fibromyalgia and depression. Therefore, the opinions of Drs. Serushan, Radzevicius, and Lucas, which relied to a substantial degree on symptoms of fibromyalgia and depression, carried no weight on the issue of permanence. The Commission further noted that even under the odd-lot theory articulated in *Valley Mould*, the claimant's failed to establish her entitlement to PTD by a

preponderance of the evidence. The Commission observed that since the claimant had been released to unrestricted work on June 30, 2006, and had marketable skills based upon her education, skills, and experience, she had failed to establish that no stable labor market existed for her. Given the record in this matter, it cannot be said that the Commission's finding that the claimant was not entitled to PTD benefits as a result of the June 1, 2006, accident was against the manifest weight of the evidence.

¶ 47                                                 III.  TTD Benefits

¶ 48        The claimant next maintains that the Commission erred in terminating her TTD benefits on November 11, 2010. The time during which a claimant is temporarily totally disabled is a question of fact. *Archer Daniels Midland Co. v. Industrial Comm'n*, 138 Ill. 2d 107, 118-19 (1990). The Commission's decision will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Id*. at 119.

¶ 49        A claimant is entitled to TTD benefits from the time an injury incapacitates him or her from work until such time as the claimant has recovered or been restored to the permanent character that the injuries will permit. *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 542 (2007). Once the claimant's condition has stabilized, the condition has become permanent and the claimant is no longer entitled to TTD benefits. *Id*. The duration of TTD is controlled by the claimant's ability to work and the continuation of the healing process. *City of Granite City v. Industrial Comm'n*, 279 Ill. App. 3d 1087, 1090 (1996). Therefore, when determining whether a claimant is entitled to continuing TTD benefits, the test is whether the claimant remains temporarily totally disabled as a result of the work-related injury and whether the claimant is capable of returning to the work force. *Interstate Scaffolding, Inc. v. Illinois Workers' Compensation Comm'n*, 236 Ill. 2d 132, 146 (2010).

¶ 50    Here, the Commission determined that the claimant was not entitled to TTD benefits after November 11, 2010, based on the factual finding that Dr. Fernandez found her to be at MMI on that date. The Commission noted that Dr. Fernandez had performed surgery on the thumb that had successfully mitigated the work-related injury and had returned her to work with a permanent restriction regarding the use of the right hand. The Commission further noted that Dr. Vender opined that the claimant's condition regarding her right hand stabilized as of the date Dr. Fernandez released her from further treatment, and that she would be able to work in an accounting related capacity after that date.

¶ 51    Given the totality of the record, it cannot be said that the Commission's determination that the claimant reached MMI on November 11, 2010, and thus, was no longer entitled to TTD benefits was against the manifest weight of the evidence. The Commission properly relied upon the opinion of the claimant's treating physician that the condition of her right hand and thumb was medically stabilized and that she could be released from further treatment for her condition, as well as the medical opinion testimony establishing that the fibromyalgia and depression symptoms were not causally related to the June 1, 2006, accident.

¶ 52                          IV. Maintenance Benefits

¶ 53    The claimant next argues that the employer violated section 8(a) of the Act and Commission Rule 7110.10 (50 Ill. Adm. Code 7110.10, amended at 30 Ill. Reg. 11743 (eff. June 22, 2006)) by failing to provide her vocational rehabilitation services. A claimant is generally entitled to vocational rehabilitation where a work-related injury has caused a reduction in earning capacity and there is evidence that rehabilitation will increase earning capacity. *Greaney v. Industrial Comm'n*, 358 Ill. App. 3d 1002, 1019 (2005). If a claimant has skills and abilities sufficient to obtain employment without further training or education, an award of vocational

rehabilitation is not necessary. *National Tea Co. v. Industrial Comm'n*, 97 Ill. 2d 424, 432 (1983). Moreover, an injured employee is generally not entitled to vocational rehabilitation where the evidence shows that he or she does not intend to return to work, although able to do so. *Euclid Beverage v. Illinois Workers' Compensation Comm'n*, 2019 IL App (2d) 180090WC, ¶ 29.

¶ 54     Whether a claimant is entitled to maintenance benefits is a question to be decided by the Commission, and its finding will not be reversed unless it is against the manifest weight of the evidence. *W.B. Olson, Inc. v. Illinois Workers' Compensation Comm'n*, 2012 IL App (1st) 113129WC, ¶ 39. For a finding of fact to be against the manifest weight of the evidence, an opposite conclusion must be clearly apparent from the record on appeal. *City of Springfield v. Illinois Workers' Compensation Comm'n*, 388 Ill. App. 3d 297, 315 (2009).

¶ 55     In the instant matter, the record supports a finding that no rehabilitation benefits were warranted. The Commission determined that the condition of the claimant's right hand and thumb was the only condition causally related to her employment. The record established that the claimant was able to secure employment within the restrictions imposed by Dr. Fernandez following the fusion surgery. Dr. Vender opined that the claimant could return to work at that point without restriction. Moreover, the employer's vocational expert, Ms. Babat, opined that the claimant possessed education and skills sufficient to obtain gainful employment without the need for rehabilitative services. It was Ms. Babat's opinion that the claimant's felony conviction was the only major impediment to her finding gainful employment. It is doubtful that any degree of vocational rehabilitation could remove that impediment.

¶ 56     Assuming, *arguendo*, that the claimant might have been entitled to rehabilitative services, she did not request a hearing on rehabilitation pursuant to section 19(b) of the Act. 820 ILCS 305/19(b) (West 2012) ("the employee may at any time petition for an expedited hearing by an

Arbitrator on the issue of whether or not he or she is entitled to receive payment of the services or compensation"). Vocational rehabilitative services are not mandatory unless the claimant can establish that rehabilitation is appropriate. *Euclid Beverage*, 2019 IL App (2d) 180090, ¶ 31. Rehabilitation is not required where the claimant has failed to request a hearing on the efficacy of rehabilitation services. *Id.* ¶ 33.

¶ 57                                    V. Penalties and Attorney Fees

¶ 58        The claimant last maintains that the Commission erred in denying her request for penalties and attorney fees. The claim for penalties and attorney fees was based upon an argument that the employer engaged in unreasonable and vexatious delay regarding payment of certain medical and TTD benefits related to her fibromyalgia and depression. As we have affirmed the Commission's determination that these issues were not causally connected to the claim against the employer, we likewise affirm the Commission's denial of penalties and attorney fees. *Tower Automotive v. Illinois Workers' Compensation Comm'n*, 407 Ill. App. 3d 427, 436 (2011).

¶ 59                                    CONCLUSION

¶ 60        For the foregoing reasons, we affirm the judgment of the circuit court of Cook County, which confirmed the decision of the Commission.

¶ 61        Affirmed.