LOGAN N. HUTSON, Appellant and Cross-Appellee, v. THE INDUSTRIAL COMMISSION *et al.* (Freeman United Coal Mining Company, Appellee and Cross-Appellant).

Fifth District (Industrial Commission Division)   No. 5—90—0842WC

Opinion filed January 16, 1992.

Harold B. Culley, Jr., of Raleigh, for appellant.

Kenneth F. Werts and Nancy R. Kuhnke, both of Craig & Craig, of Mt. Vernon, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

The claimant, Logan N. Hutson, appeals from the judgment of the circuit court confirming the decision of the Illinois Industrial Commission (hereafter referred to as the Commission), which modified the decision of the arbitrator. The Commission found that the claimant is permanently disabled to the extent of 60% under section 8(d)(2) of the Illinois Workers' Compensation Act (Ill. Rev. Stat. 1985, ch. 48, par. 138.8(d)(2)), as provided by section 7 of the Illinois Workers' Occupational Diseases Act (Ill. Rev. Stat. 1985, ch. 48, par. 172.42), and affirmed as to all other issues. The arbitrator had found the claimant permanently disabled to the extent of 20% of the body as a whole. The employer, Freeman United Coal Mining Company, cross-appeals.

The claimant raises a single issue for review: whether the Commission erred in determining the nature and extent of his disability by failing to apply the proper burden of proof. The employer presents five issues for review: (1) whether the Commission erred in determining the nature and extent of claimant's alleged disability; (2) whether the Commission erred in determining that the claimant's last day of exposure was February 4, 1981; (3) whether the Commission erred in determining that an occupational disease exists which arose out of and in the course of the claimant's employment by the respondent employer; (4) whether the Commission erred in determining that the claimant's condition of ill-being is causally related to an occupational disease; and (5) whether the Commission erred in determining that the claimant suffered disablement from an occupational disease within two years from the date of his alleged last exposure.

At the hearing before the arbitrator, conducted on May 10, 1988, the claimant testified in his own behalf that he had worked as a coal miner for approximately 27 years, having last worked on February 4, 1981. He was 63 years old at the time of the hearing. He began working as a coal miner in 1948 cleaning tracks underground. Thereafter he worked underground as a timberman and coal shooter. Between 1954 and 1962 he did not work as a coal miner but worked "with automatic vending machines," did "general labor work," and "worked on the railroad as extra gang line, new steel, new track." He also worked for the State of Illinois for about a year and a half during that time. In 1962 he resumed work as an underground coal miner, working as a "general laborer, shooter, mine examiner and face foreman" until February of 1979, when he was laid off. In April of 1979 he resumed work as an underground coal miner, employed this time by the respondent and working as a "brattice man. I did general labor work and examining, a little bit of everything." He worked for the respondent until February 4, 1981.

He stated that he had never worked a day in the coal mines when he was not exposed to dust. He stopped working at the age of 55 because he was "sick." On February 4, 1981, the claimant did not work, he said, but called in sick and, because he was having trouble breathing, saw his doctor, Dr. Scott Zimmerman. He testified that he had been having breathing problems for "at least" 10 years prior to that time. Asked, "Did your breathing problems affect your ability to do your job?" the claimant answered, "It could have, yes." He stated that he had smoked about a package of cigarettes a day for approximately 30 years but no longer smoked, having stopped smoking sometime between 1975 and 1978.

On cross-examination he testified that after he graduated from high school, he was in the United States Navy for 42 months during World War II. Since he last worked in February of 1981, he said, he has not applied for any kind of employment, stating, "I'm not able to work." He worked as a mine examiner, he testified, from about 1965 until 1975 and as a face foreman from 1975 until 1979.

On redirect examination the claimant testified that a brattice man "fills stopping, either tin, wood or block or to the direction of the ventilation of the air in your mine." As part of that job he was required to haul concrete blocks weighing approximately 90 pounds.

Dr. Zimmerman, a physician in general practice, testified on behalf of the claimant by evidence deposition taken on March 25, 1987. Dr. Zimmerman was uncertain about the date on which he had first seen the claimant. The records available to him indicated a possible initial visit of February 3, 1981. He sees the claimant about once every two to three months and had seen him the week before the deposition. In February of 1981 and October of 1983 the witness conducted pulmonary function studies. On the test given in February of 1981 the claimant did "very poorly," the interpretation of which indicated "a combined obstructive and restrictive ventilatory defect." The results of the test given in October of 1983 were "a little bit better."

Asked whether in his opinion the claimant has pneumoconiosis, Dr. Zimmerman answered as follows:

> "Well, I feel that he does. He obviously has chronic lung disease and there is, based on his pulmonary function test, a restrictive component to it and based on his chest X-ray reports there is some evidence of interstitial fibrosis. I believe that these are some of the requirements before you can define coal miners['] pneumoconiosis and these are present in his lung disease. Now, there is an obstructive component, which I don't know if it's all due to working in the mines or primarily due to smoking, but I'm sure both factors combined have led to the way he is now."

With respect to any impairment suffered by the claimant as a result of his coal workers' pneumoconiosis, the witness stated:

> "He has a long history since I've known him of shortness of breath with exertion and occasionally when I see him he has problems with shortness of breath at rest. In addition he has frequent respiratory infections and this is something which—I remember when I first met Logan he was still working in the mines and he came in with these symptoms and he was getting worse at that time. He retired shortly thereafter and since that

time he has improved somewhat. So I feel that working in the mines has contributed to this problem."

The witness testified that in his opinion, given his impairment, the claimant would not be able to be gainfully employed as a coal miner. He described coal workers' pneumoconiosis as "mostly irreversible."

On cross-examination Dr. Zimmerman expressed the view that "anything over probably 20" pack years of smoking would be considered "a heavy exposure." He stated that pulmonary function tests are "definitely" effort-dependent. Concerning improvement with the passage of time in the results of claimant's pulmonary function tests, the witness observed that "[m]aybe they would get better in a certain degree as any reversible component reversed itself, but I would not expect them to achieve normality due to the significant amount of lung disease which he already has." The witness expressed the view that he did not think the claimant has significant coronary artery disease.

On redirect examination he testified that chronic respiratory disease was the claimant's most significant problem. He stated that the root cause of claimant's pulmonary distress was the inhalation of coal dust and cigarette smoke in combination. The witness was unable, however, to "quantify" what the cigarette smoking might have caused. He expressed the belief that coal workers' pneumoconiosis is "definitely" a factor contributing to the claimant's respiratory distress. Exposure to coal dust would, in the opinion of the witness, be injurious to the claimant.

Dr. Parviz B. Sanjabi, board-eligible in internal medicine and pulmonary medicine, testified on behalf of the claimant by evidence deposition taken on May 8, 1987. The witness had examined the claimant on April 17, 1986, at which time his main complaints were shortness of breath and reduction of exercise tolerance. "And when I obtained the history of this problem from him," the witness said, "he has stated that he is not able to walk more than a couple of blocks on level ground. And when he climbs up one flight of stairs, he gets short of breath and he cannot continue." He had a history "for quite a few years" of coughing and producing sputum, particularly in the morning. The claimant gave a work history of working underground in the coal mines for 25 years and a 40-pack-year history of smoking, which he had discontinued in 1977. The witness described 25 years of working as an underground coal miner as a "significant exposure." He considered 40 years of cigarette smoking a "significant history" as well. X rays showed that "there were findings compatible with what I considered coal worker[s'] pneumoconiosis of simple variety." He described simple coal workers' pneumoconiosis as existing

"when the X-ray findings indicates [*sic*] deposits of coal dust in the parenchyma, in the tissue of the lung, but there is not body reaction in way of presence of fibrosis or scar tissue formation in addition to the coal deposit. So when scar formation is not present, we call that simple coal workers['] pneumoconiosis."

The results of a pulmonary function test that was performed at the time of examination demonstrated "severe obstructive pattern." Obstruction pattern occurs, the witness stated, when the flow of air through the airways is reduced because of narrowing and tightening of the airways. In the opinion of the witness, based upon the physical examination, laboratory values, and the X-ray finding, the claimant has coal workers' pneumoconiosis. This condition was caused, in Dr. Sanjabi's opinion, by "[w]orking in the coal mines." The claimant suffers further, he said, from chronic bronchitis.

According to the results of the pulmonary function study, the claimant has an obstructive defect. Dr. Sanjabi testified that the inhalation of coal dust can cause an obstructive defect. Likewise, the inhalation of cigarette smoke can cause an obstructive defect. Dr. Sanjabi could not quantify the amount of the claimant's impairment that was related to the inhalation of coal dust as opposed to the amount of his impairment that was related to the inhalation of cigarette smoke.

The witness described coal workers' pneumoconiosis as a chronic, irreversible disease. Persons who have a diagnosis of coal workers' pneumoconiosis should not be exposed to a very dusty environment. Continued inhalation of coal dust would, he said, aggravate the claimant's preexisting condition. Asked whether the claimant is disabled from doing heavy manual labor as a result of his respiratory problems, the witness responded as follows:

"That would be a very difficult question to answer, Mr. Culley, because the definition of heavy and the amount of work required with it is really not clear to me, and also the correlation of the limited pulmonary function test that we have here to the exact oxygen uptake and exercise tolerance is not quite clear here and it would be difficult to answer that question because of those.

However, folks who have an FEV1 of about 40 per cent or so usually will have a very limited exercise tolerance and they are impaired considerably. But in order to answer that question, one has to know exactly how much energy requirement we're talking about and how often and for how long. To be able to answer that question, we need those informations which we don't usually obtain in physical examination of this magnitude."

Earlier he testified with respect to the results of the pulmonary function test administered to the claimant that "[h]is forced expiratory volume of one second measured 1.31 liter which was 41 percent of his predicted value."

On cross-examination Dr. Sanjabi testified that smoking can cause a reduction in a person's exercise tolerance and can result in shortness of breath. Pulmonary function tests are to some extent effort-dependent. He testified that the obstructive pattern is seen in both coal workers' pneumoconiosis and bronchitis. There is, he reiterated, no way to determine from the results of the pulmonary function test whether reductions in pulmonary function shown by the results of the test are caused by smoking or by coal dust. The findings on the X ray taken of the claimant indicated mild, simple pneumoconiosis. Asked, "Would that finding of simple coal workers['] pneumoconiosis and the changes you saw to indicate that, would those suggest that there would be any impairment as a result of those findings or those things that you saw on the X-ray?" Dr. Sanjabi responded, "The impairment seen with that level of X-ray findings are [sic] usually much less and limited." Asked further, "So it would be a slight impairment?" Dr. Sanjabi answered "If any, yeah." He stated that "physiologically it's advisable for people who have as severe pulmonary function variation as this gentleman has not to be exposed to whatever irritates their airways." Coal dust is a nonspecific airways irritant, and thus, it would be best for claimant not to be exposed to it but to work in an area where it is not dusty. He testified that "[i]n the type of coal workers['] pneumoconiosis that we see especially in this part of the country, the restrictive condition would be very rare. So usually we see obstructive condition."

Dr. Edward Campbell testified on behalf of the employer by evidence deposition taken on May 6, 1988. The witness is board-certified in internal medicine and is certified in the subspecialty of pulmonary disease. He examined the claimant in February of 1988. The claimant had told him, he said, that he had smoked approximately one pack of cigarettes daily for about 20 years but had stopped smoking in 1979. Chest X rays the witness had had taken were essentially normal; he found no evidence of abnormalities in the lung fields that would be suggestive either of congestive heart failure or pneumoconiosis. According to studies performed during the examination, the arterial blood gases were normal. The results of pulmonary-function tests, as interpreted by Dr. Campbell, indicated the presence of "a moderate and severely obstructive abnormality of ventilatory function" as well as a moderately reduced diffusing capacity. The results of a pulmo-

nary-exercise test indicated to Dr. Campbell that the predominant factor limiting the claimant's exercise capability was heart disease. This test also gave evidence of lung disease. Dr. Campbell diagnosed the claimant as having chronic bronchitis, a moderate obstructive abnormality of ventilatory function, coronary artery disease with angina pectoris, and a moderate to marked exercise limitation "with evidence suggesting that coronary artery disease and a cardiac cause was [sic] responsible" for this limitation. Dr. Campbell felt that, based upon the claimant's history and exercise evaluation, he should be considered "totally and permanently disabled to such an extent that he would be unable to perform the regular coal mine work that he described to me or any other work requiring a similar effort."

Dr. Campbell felt further that the major cause of claimant's exercise limitation and disability was coronary artery disease with myocardial ischemia and angina pectoris. In the opinion of the witness, if claimant's lung disease were present and his heart disease were absent, claimant's exercise capability would be at least moderately restricted on account of his lung disease and he would probably be unable to perform "his last previous coal mine job as a concrete block layer." With respect to the cause of the impairment of the claimant's ventilatory function, the witness expressed the view that this abnormality "would be entirely consistent with chronic bronchitis and emphysema resulting from this man's previous history of cigarette smoking." Dr. Campbell found "no evidence of an abnormality in a pattern which would suggest that the abnormality was due to pneumoconiosis." He stated that chronic bronchitis and emphysema are typically associated with an obstructive pattern of abnormalities, which pattern he observed in the claimant, whereas coal workers' pneumoconiosis is typically associated with a quite different pattern of ventilatory abnormalities, which pattern he did not observe in the claimant. "On this basis," he said, "I felt that it was possible to say within a reasonable degree of medical certainty that this abnormality observed in [the claimant] was due to chronic bronchitis and emphysema rather than to coal worker's pneumoconiosis or other occupational lung disease."

On cross-examination Dr. Campbell testified that the claimant has significant lung disease and that "anything more than a sedentary job would be impossible for him to perform in my opinion." Viewing the claimant as a man as a whole, he said, his lung disease is a contributing factor to his overall disability. Dr. Campbell did not think that exposure to coal mine dust alone could cause chronic bronchitis of "this severity and persistence." It could, however, in his opinion have been

a causative factor in the development of claimant's chronic bronchitis. In his further opinion, however, exposure to coal mine dust could not have been a causative factor in the development of his emphysema. Claimant's bronchitis and emphysema, in Dr. Campbell's opinion, together have resulted in chronic airways obstruction. He cannot determine how much of the claimant's chronic obstructive pulmonary disease is due to emphysema and how much of it is due to chronic bronchitis. He indicated that a person can have disabling lung disease despite a normal physical examination, a normal chest X ray, and normal arterial-blood-gas studies.

No additional evidence was presented on review. In setting forth its reasons for finding as it did, the Commission expressly assigned "the greatest weight" to the medical opinion of Dr. Sanjabi and "more weight" to the medical opinion of Dr. Zimmerman than to that of Dr. Campbell. The Commission noted that Dr. Sanjabi had recommended that the claimant avoid exposure to coal dust and that Dr. Zimmerman had opined that the claimant could not return to work as a coal miner. The Commission found further, citing *E.R. Moore Co. v. Industrial Comm'n* (1978), 71 Ill. 2d 353, 376 N.E.2d 206, that the claimant "failed to prove that as the result of an occupational disease he is unable to perform any other regular and continuous employment for which he is qualified."

In claimant's brief, with respect to the issue he raises for review, he contends that he is totally and permanently disabled. He maintains that the Commission applied an improper standard in determining the nature and extent of his disability, asserting that he made a *prima facie* showing he fell within the "odd-lot" category but the Commission erred in that it "never shifted the burden" to the employer to show the availability of some kind of regular and continuous employment which he is capable of performing.

■■ The determination of the extent or permanency of the employee's disability is a question of fact, and the Commission's decision will not be set aside unless it is against the manifest weight of the evidence. (*Esposito v. Industrial Comm'n* (1989), 186 Ill. App. 3d 728, 542 N.E.2d 843.) The claimant has the burden of proving by a preponderance of the evidence the extent and permanency of his injury. (*Esposito*, 186 Ill. App. 3d 728, 542 N.E.2d 843.) Once the claimant has met this burden, then the respondent must show that some kind of competitive market work is regularly and continuously available to the claimant. (*Esposito*, 186 Ill. App. 3d 728, 542 N.E.2d 843.) The degree of the disability is dependent upon the extent to which the

medical disability has impaired the employee's earning capacity or ability to work. *E.R. Moore Co.*, 71 Ill. 2d 353, 376 N.E.2d 206.

■ The standard by which permanent and total disability is judged is as follows:

"[A]n employee is totally and permanently disabled under the Act when 'such employee is unable to make some contribution to the work force sufficient to justify the payment of wages.' [Citations.] However, a claimant is not required to demonstrate total incapacity or helplessness before a permanent total disability award may be granted. [Citations.] A person is totally disabled when he cannot perform any services except those that are so limited in quantity, dependability or quality that there is no reasonably stable market for them. [Citations.] Conversely, if an employee is qualified for and capable of obtaining gainful employment without seriously endangering his health or life, he is not entitled to total and permanent disability compensation." (*Interlake, Inc. v. Industrial Comm'n* (1981), 86 Ill. 2d 168, 176, 427 N.E.2d 103, 107.)

In determining whether the employee is capable of performing any useful services, the Commission must consider the age, training, education, and skills of the employee, the extent of the injury, and the nature of the employment. (*Caradco Window & Door v. Industrial Comm'n* (1981), 86 Ill. 2d 92, 427 N.E.2d 81.) As was stated in *Valley Mould & Iron Co. v. Industrial Comm'n* (1981), 84 Ill. 2d 538, 546-47, 419 N.E.2d 1159, 1163:

"[I]f the claimant's disability is limited in nature so that he is not obviously unemployable, or if there is no medical evidence to support a claim of total disability, the burden is upon the claimant to establish the unavailability of employment to a person in his circumstances. However, once the employee has initially established that he falls in what has been termed the 'odd-lot' category (one who, though not altogether incapacitated for work, is so handicapped that he will not be employed regularly in any well-known branch of the labor market (2 A. Larson, Workmen's Compensation sec. 57.51, at 10-164.24 (1980)), then the burden shifts to the employer to show that some kind of suitable work is regularly and continuously available to the claimant (2 A. Larson, Workmen's Compensation sec. 57.61, at 10-164.97 (1980))."

It is the province of the Commission to weigh the evidence and to draw reasonable inferences therefrom in the first instance, and a reviewing court will not overturn its findings simply because a different

inference could be drawn. (*Niles Police Department v. Industrial Comm'n* (1981), 83 Ill. 2d 528, 416 N.E.2d 243.) The resolution of conflicting medical testimony is a question of fact for the Commission; its determination will be upheld unless contrary to the manifest weight of the evidence. *Ceco Corp. v. Industrial Comm'n* (1983), 95 Ill. 2d 278, 447 N.E.2d 842.

■ The Commission expressly found that in the opinion of Dr. Sanjabi, to whose medical opinion it assigned the greatest weight, the claimant was "considerably impaired." Dr. Sanjabi did not indicate, however, that the claimant was totally disabled, testifying instead that, because he did not have enough information, it would be "very difficult" to answer the question whether the claimant is disabled from doing heavy manual labor as a result of his respiratory problems. The claimant, a high school graduate, testified that he had been employed in various positions for an eight-year period after he had worked as a coal miner for a number of years and before he returned to work as a coal miner. These positions were described, if at all, very generally. Thus, the record does not show that the claimant is either a person altogether incapacitated for work or a person who is so handicapped that he will not be employed regularly in any well-known branch of the labor market. Since the claimant did not make out a *prima facie* case that he fell in the odd-lot category, the burden remained upon him to show that, considering his present condition, in light of his age, experience, training, and education, he is permanently and totally disabled as set forth above. (See *Valley Mould & Iron Co.*, 84 Ill. 2d 538, 419 N.E.2d 1159.) This burden may be met by a showing of diligent but unsuccessful attempts to find work or by proof that because of the above-mentioned qualities he is unfit to perform any but the most menial tasks for which no stable market exists. (*Valley Mould & Iron Co.*, 84 Ill. 2d 538, 419 N.E.2d 1159.) The claimant made neither showing. It was not against the manifest weight of the evidence for the Commission to have concluded, as it did, that the claimant failed to prove that as the result of an occupational disease he is unable to perform any other regular and continuous employment for which he is qualified.

■ With regard to the employer's cross-appeal, to the extent that the employer specifically addresses each of the five issues it presents for review, it contends essentially that the Commission's findings are against the manifest weight of the evidence. The employer maintains that the claimant failed to establish that he is disabled as a result of a work-related disease; that the Commission's finding that the claimant was last exposed on February 4, 1981, to an occupational disease aris-

ing out of and in the course of his employment is against the manifest weight of the evidence; that the finding that the claimant is disabled as a result of exposure to an occupational disease arising out of and in the course of his employment is against the manifest weight of the evidence; that the Commission's decision that the claimant's disability is causally related to an occupational disease, namely coal workers' pneumoconiosis, is against the manifest weight of the evidence; and that the claimant's contention that he sustained disablement within two years of the last day of the last exposure to the hazards of an occupational disease is not borne out by the evidence.

The resolution of conflicting medical testimony falls within the purview of the Commission, and its findings will not be reversed unless contrary to the manifest weight of the evidence. (*Johns-Manville Products Corp. v. Industrial Comm'n* (1979), 78 Ill. 2d 171, 399 N.E.2d 606.) When the Commission is faced with the question of which of two conflicting views of medical testimony should be adopted, it is for the Commission to ascertain the testimony that is to be accepted. (*International Harvester v. Industrial Comm'n* (1982), 93 Ill. 2d 59, 442 N.E.2d 908.) It is within the prerogative of the Commission to decide disputed issues of fact involving diverse medical opinions, including those of causal connection. *International Harvester*, 93 Ill. 2d 59, 442 N.E.2d 908.

It would serve no useful purpose to reiterate the facts stated above. As we have said, the Commission expressly assigned "the greatest weight" to the medical opinion of Dr. Sanjabi and "more weight" to the medical opinion of Dr. Zimmerman than to that of Dr. Campbell. The testimony of Drs. Sanjabi and Zimmerman, together with that of the claimant, supports the findings of the Commission disputed by the employer. These findings were not contrary to the manifest weight of the evidence and, thus, may not be disturbed.

The judgment of the circuit court confirming the decision of the Commission is accordingly affirmed.

Affirmed.

McCULLOUGH, P.J., and WOODWARD, STOUDER, and RAKOWSKI, JJ., concur.