2020 IL App (5th) 190522WC

Order filed October 19, 2020
Motion to publish granted November 16, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

_____

| | | |
|---|---|---|
| THE AMERICAN COAL COMPANY, | ) | Appeal from the Circuit Court |
| | ) | of the First Judicial Circuit, |
| Appellant, | ) | Williamson County, Illinois |
| | ) | |
| v. | ) | Appeal No. 5-19-0522WC |
| | ) | Circuit No. 19-MR-148 |
| | ) | |
| THE ILLINOIS WORKERS' | ) | Honorable |
| COMPENSATION COMMISSION *et al.* | ) | Jeffrey A. Goffinet, |
| (Robert Deere, Appellees). | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.

Justices Hoffman, Hudson, Cavanagh, and Barberis concurred in the judgment and opinion.

_____

**OPINION**

¶ 1    The claimant, Robert Deere, filed a claim for benefits under the Workers' Occupational Diseases Act (Act) (820 ILCS 310/1 *et seq.* (West 2014)) against the respondent, American Coal Company (employer), for injuries to his lungs, heart, pulmonary system, and respiratory tracts that he alleged were caused by exposure to coal dust and other substances during the 40-year period that he worked as a coal miner. After conducting a hearing, the arbitrator found that the claimant

- 1 -

had failed to prove that he sustained an occupational disease arising out of and in the course of his employment, that his current condition of ill-being was causally connected to his employment, or that he suffered a timely disablement under section 1(f) of the Act (820 ILCS 310/1(f) (West 2014)). Accordingly, the arbitrator denied the claimant's claim for benefits.

¶ 2 The claimant appealed the arbitrator's decision to the Illinois Workers' Compensation Commission (Commission), which affirmed the arbitrator's decision in part and reversed in part. The Commission affirmed the arbitrator's finding that the claimant had failed to prove that he suffered from coal miner's pneumoconiosis (CWP). However, the Commission found that the claimant had sustained chronic obstructive pulmonary disease (COPD) and chronic bronchitis arising out of or and the course of his employment and that the claimant's current condition of ill-being due to both of those conditions was causally related to his employment. The Commission further found that the claimant was permanently disabled to the extent of 10% of the person as a whole and ordered the employer to pay the claimant permanent partial disability (PPD) benefits pursuant to section 8(d)(2) of the Illinois Workers' Compensation Act (820 ILCS 305/8(d)(2) (West 2014)) in the amount of $735.37 for a period of 50 weeks.

¶ 3 The employer sought judicial review of the Commission's decision before the circuit court of Williamson County. The circuit court confirmed the Commission's decision.

¶ 4 This appeal followed.

¶ 5 FACTS

¶ 6 The following factual recitation is taken from the evidence presented at the arbitration hearing conducted on March 14, 2018.

¶ 7 The claimant worked in coal mines for 40 years. He worked below ground for all but the first two years of his employment. The claimant testified that, during the course of his

employment, he was regularly exposed to and breathed silica dust, roof bolting glue fumes, diesel fumes and "trowel on" (a glue used to put tiles up on the wall of the mine). The claimant retired from coal mining in 2015 at age 62. His last day of work was January 30, 2015. He testified that he was exposed to coal dust on the date he retired.

¶ 8    On March 27, 2015, the claimant filed an Application for Adjustment of Claim seeking benefits under the Act for what he claimed were employment-related injuries to his lungs, heart, pulmonary system, and respiratory tracts.

¶ 9    The claimant's medical records from Logan Primary Care were admitted into evidence. These records indicate that the claimant had received treatment for various respiratory and other medical issues from December 1999 through July 2013. During that time period, the claimant was repeatedly treated for sinusitis, multiple respiratory infections, and cough. His cough was sometimes accompanied by the production of sputum. At other times, his cough was nonproductive. When the claimant's breathing was examined by stethoscope, his lungs were found to be clear.

¶ 10    At the request of his counsel, the claimant saw Dr. Glennon Paul on November 12, 2015. Dr. Paul is the Medical Director of St. John's Hospital's Respiratory Therapy Department and Clinical Assistant Professor of Medicine at Southern Illinois University Medical School. Dr. Paul examined the claimant and produced a written report. Dr. Paul's report stated that the claimant was a 63-year-old nonsmoker who was retired and did not expect to go back to work. The claimant told Dr. Paul that: (1) he had worked in coal mines for 40 years; (2) all of his work had been underground, but he mostly worked at the face of the mine as a machine miner; (3) he had suffered from respiratory infections four to five times per year for several years prior to Dr. Paul's examination; (4) he would have coughing and wheezing whenever he had an upper respiratory

tract infection, and each such infection would last for approximately two months; and (5) he did not seek medical treatment for these infections. Dr. Paul noted in his report that the claimant's physical examination was normal. His lungs showed normal inspiratory and expiratory effort with no chest wall deformities or dullness to percussion. When Dr. Paul listened to the claimant's chest with a stethoscope, he heard no wheezes or rales (*i.e.*, abnormal rattling sounds). The claimant's CBC was normal, and his pulmonary function studies were within normal limits. A chest x-ray revealed some fibronodular lesions through both lung fields to a mild to moderate degree. Dr. Paul's impression was simple type CWP.

¶ 11     Two days later, at the request of the claimant's attorney, Dr. Henry K. Smith reviewed the claimant's November 12, 2015, chest x-ray. Dr. Smith is a board certified radiologist and B-reader. Dr. Smith interpreted the claimant's x-ray as positive for CWP, profusion 1/0 with P/P opacities in all lung zones. Dr. Smith also found interstitial fibrosis in all lung zones, mildly thickened interlobular fissures, and mild thoracic atherosclerosis. Dr. Smith was not deposed and did not testify during the arbitration hearing.

¶ 12     At the employer's request, Dr. Christopher Meyer, a radiologist and B-reader, also reviewed the claimant's November 12, 2015, chest x-ray. Dr. Meyer interpreted the x-ray as negative for CWP. Dr. Meyer further noted that he had reviewed a narrative summary and B-reading form prepared by Dr. Smith regarding the same chest x-ray. Dr. Meyer disagreed with Dr. Smith's finding of small opacities of size "P" with profusion of 1/0. Dr. Meyer concluded that the claimant's lungs were clear and there was no indication of CWP.

¶ 13     At the employer's request, Dr. James Castle, a pulmonologist and B-reader who is board certified in internal medicine and in the subspecialty of pulmonary disease, reviewed the claimant's medical records (including the November 12, 2015, x-ray) and issued a written report.

Dr. Castle concluded that the claimant did not suffer from any pulmonary disease or impairment occurring as result of his occupational exposure to coal mine dust. He found the pulmonary function study of November 12, 2015, to be entirely normal. He also found that the November 12, 2015, chest x-ray showed no evidence of any parenchymal abnormalities consistent with CWP. He further noted that, because Dr. Smith had found a profusion of "1/0," that meant that Dr. Smith acknowledged the x-ray could be negative for CWP.

¶ 14      Dr. Meyer was deposed on September 30, 2016. During his deposition, Dr. Meyer testified that he has been board certified in radiology since 1992 and a B-reader since 1999. Dr. Meyer testified that he does about 160 to 200 B-readings per month. He acknowledged that he is generally retained by the coal company rather than the coal miner. Dr. Meyer stated that, in diagnosing CWP or certain other pulmonary conditions, a B-reader looks at the lungs to decide whether there are any small nodular opacities or any linear opacities. Specific occupational lung diseases exhibit specific types of opacities. The B-reader also looks at the distribution and density of the opacities in the lungs.[1] Dr. Meyer testified that, when he reviewed the claimant's November 12, 2015, x-ray, he found that the claimant's lungs were clear and there was no evidence of CWP.

¶ 15      Dr. Paul was deposed on February 17, 2017. During his deposition, Dr. Paul testified that he is board certified in asthma, allergy and immunology. He was the senior physician at the Central Illinois Allergy & Respiratory Clinic. The physicians who practice at that clinic specialize in the treatment of allergic diseases and pulmonary disease. Dr. Paul was never board certified in pulmonary disease, and he is not a B-reader. Dr. Paul stated that he has seen hundreds of individuals at the request of the claimant's counsel.

---

[1]CWP opacities typically occur in the upper lung zones, and a small-opacity profusion rating of 1/0 or greater is considered evidence of CWP.

¶ 16        Dr. Paul testified that it was his understanding that the claimant was a lifelong nonsmoker. The claimant worked for 40 years in the coal mines, all underground. According to Dr. Paul, the claimant had coughing and wheezing during upper respiratory infections which would hang on about two months, and the claimant would get these infections four or five times per year. Dr. Paul testified that the amount of coughing that the claimant exhibited (*i.e.*, coughing 8 to 10 months a year for a number of years) fulfilled the definition of chronic bronchitis.

¶ 17        Although Dr. Paul acknowledged that he had recorded in his report that the claimant's pulmonary function tests were within normal limits, he contradicted that opinion during his deposition. In his deposition testimony, Dr. Paul opined that the pulmonary function testing he had performed on the claimant before he issued his report were not within normal limits under the AMA Guides to Impairment, Sixth Edition. Specifically, Dr. Paul opined that the claimant's lung function would be considered mildly abnormal under the AMA Guides based on the FEV1/FVC ratio.[2] Dr. Paul concluded that this abnormal lung function indicated an obstructive impairment compatible with chronic bronchitis. Dr. Paul further opined that the claimant's chronic bronchitis was caused by coal dust exposure.

¶ 18        Dr. Paul also concluded that the claimant had both CWP and COPD caused by the coal dust environment he encountered during his employment.[3] He testified that, in light of these

---

[2]The "FEV1/FVC ratio" is a calculated ratio used in the diagnosis of obstructive and restrictive lung disease. It represents the proportion of a person's vital capacity that he is able to expire in the first second of forced expiration (FEV1) to his full, forced vital capacity (FVC). The result of this ratio is expressed as a percentage. Dr. Paul testified that, under the AMA Guides, a normal FEV1/FVC is a ratio of 75% or more. When Dr. Paul tested the claimant on November 12, 2015, he calculated the claimant's FEV1/FVC ratio to be 74%.

[3]In support of his diagnosis of CWP, Dr. Paul noted that the claimant's x-ray revealed multiple different types of opacities, and they were all of a type caused by exposure to coal dust. However, Dr. Paul did not remember which lung zones were involved, and he did not provide a profusion rating.

diagnoses, the claimant could not have any further exposure to the environment of a coal mine without endangering his health.

¶ 19   Dr. Paul stated that he did not review the claimant's medical treatment records. When he examined the claimant, the claimant did not complain of shortness of breath. The claimant was not taking any breathing medications when Dr. Paul saw him, and he did not provide a history of ever having taken such medications. Nor did the claimant present any medical history of black lung. The claimant's total lung capacity was normal. He had no restriction. His blood gases were normal, and he did not have an impairment in gas exchange.

¶ 20   Dr. Paul testified that the claimant did not tell him that he left mining at the time he did due to a breathing problem. Nor did the claimant tell Dr. Paul that he left mining on the advice of a physician or that he was unable to perform the duties of his last job in the mine.

¶ 21   Dr. Castle was deposed on June 8, 2017. Dr. Castle testified that he is a board certified pulmonologist and has been certified as a B-reader since 1985. Dr. Castle practiced in Roanoke, Virginia for 30 years. His practice was limited to pulmonary disease and chest disease, which encompassed critical care medicine. Dr. Castle's practice included patients with occupational lung disease. Some patients in his practice had CWP.

¶ 22   Dr. Castle testified that, when he reviewed the claimant's November 12, 2015, chest x-ray, there were no parenchymal abnormalities consistent with CWP. Dr. Castle found no evidence of CWP or of any coal mine dust induced lung disease on the x-ray.

¶ 23   Dr. Castle testified that the pulmonary function study performed on the claimant on November 12, 2015, was entirely normal. Dr. Castle opined that Dr. Paul had erred in calculating the claimant's FEV1/FVC ratio. Dr. Castle stated that, to determine a patient's FEV1/FVC ratio, one must take the greatest forced vital capacity (FVC) and the greatest forced expiratory volume

(FEV1) in one second. Dr. Castle testified that Dr. Paul did not do that. According to Dr. Castle, when the highest FEV1 and the highest FVC from Dr. Paul's testing are used, the claimant's FEV1/FVC ratio was 75%, which is in the normal range. Dr. Castle stated that this is exactly what was predicted for the claimant.

¶ 24        Dr. Castle further testified that the medical evidence did not indicate an obstruction. Dr. Castle stated that, according to the AMA Guides to the Evaluation of Permanent Impairment, Sixth Edition, the claimant would fall under Class 0 impairment. Dr. Castle concluded that there was no evidence that the claimant suffered from any physiologic abnormality caused by CWP, exposure to coal dust, or any other cause. He opined that the claimant did not suffer from any pulmonary disease or impairment occurring as a result of his occupational exposure to coal mine dust.

¶ 25        Dr. Castle also reviewed the claimant's medical records. He noted that the records did not indicate that the claimant was ever diagnosed with chronic bronchitis or COPD. Nor did the claimant's medical records document that the claimant had respiratory infections four or five times per year. Dr. Castle further testified that cough is not considered an objective determinate of pulmonary impairment. He stated that his review of the medical records revealed no evidence of disease or pathology. According to Dr. Castle, the objective testing performed on the claimant established that, from a respiratory standpoint, the claimant was capable of performing heavy manual labor.

¶ 26        On January 16, 2018, the claimant returned to Logan Primary Care where he was treated for hypertension. The claimant reported that he was physically active at that time and was exercising on an elliptical machine three or four times per week. He did not have any shortness of breath. On physical examination, the claimant's respiratory effort was normal.

¶ 27      The claimant was again seen on January 20, 2018, and was diagnosed with an upper respiratory infection. His symptoms included congestion, a sore throat, and a nonproductive cough. The claimant reported that these symptoms had been present for three days. The physician's assistant who treated the claimant opined that this was an acute condition that could be treated with medication.

¶ 28      On January 30, 2018, the claimant retuned to Logan Primary Care for follow up on his hypertension. The claimant reported that his acute sore throat was better, but he still had minor cough. He had no shortness of breath or wheezing.

¶ 29      The claimant testified that he worked in a coal mine for 40 years with the first two years being above ground and the last 38 being below ground. He stated that, in addition to coal dust, he was regularly exposed to and breathed silica dust, roof bolting glue fumes, diesel fumes, and "trowel on" glue.

¶ 30      The claimant's last date in coal mining was January 30, 2015. At that time, the claimant was 62 years old and was working for the employer at its Galatia mine. His job classification was mine examiner. The claimant testified that he was exposed to coal dust on his last day of work. The claimant stated that January 30, 2015, was his last day at work because he "retired." When asked why, the claimant stated that he had "had enough." The claimant has not looked for work or been employed since retiring from the employer.

¶ 31      The claimant testified that he first noticed his breathing problems at work during the early to mid-1980s. His breathing would become labored and he would cough up black sputum. He noticed a difference in his breathing ability and he would get tired. From the time he first noticed these breathing problems until he left the mines, his breathing issues did not get any better. At times, they got a little worse.

¶ 32        The claimant further testified that his breathing problems have stayed pretty much the same since he left the mine. Although he does not take any breathing medications, he cannot seem to take a deep breath. He has to stop and rest while doing yard work or playing with his grandchildren. He used to be very active in sports, but he has not played any sports for approximately 20 years. He quit bike riding and cannot run anymore. Although he still hunts, he can no longer trek deep into the woods like he used to, and he now tries to stay closer to the edge near the road. He tries to walk on the treadmill a little bit to keep himself in as good of shape as he can. He also works out on an elliptical machine three or four times per week for 30 minutes each time, and he does some light lifting.

¶ 33        The claimant stated that he saw his family physicians at Logan Primary Care for breathing difficulties. He testified that, when he would get bronchitis, he could not breathe and he would go to his doctors for treatment. The claimant stated that, when he treated with his family doctors, he was honest with them in sharing whatever respiratory complaints he had or did not have. He was also honest with Dr. Paul in sharing his respiratory problems. The claimant testified that he has never smoked. He takes medication for blood pressure.

¶ 34        The claimant further stated that, from time to time over the years, he underwent chest x-ray screening by NIOSH for black lung. After he underwent a chest x-ray, NIOSH would write to him and tell him what the chest x-ray revealed. The claimant testified that he had the NIOSH letters with him in his car at the time of arbitration. He stated that he did not bring these letters to the arbitration hearing because he did not know if he would need them.

¶ 35        The arbitrator found that the claimant had failed to prove by a preponderance of the evidence that he had sustained an occupational disease arising out of and in the course of his employment. The arbitrator concluded that the claimant did not have CWP. The arbitrator further

found that the claimant had failed to prove that he suffered from work-related COPD and chronic bronchitis. The arbitrator did not find Dr. Paul's opinions that the claimant had these conditions to be persuasive. In support of this conclusion, the arbitrator noted that: (1) Dr. Paul failed to mention that the claimant had chronic bronchitis or COPD in his initial report; (2) Dr. Paul acknowledged that the claimant had no complaints of shortness of breath when he examined him, and the claimant was not taking any breathing medications; (3) other than the FEV1/FVC ratio (which Dr. Paul considered to be "mildly" abnormal), Dr. Paul's examination found everything about the claimant to be normal; (4) the claimant's medical records did not corroborate the medical history that he gave to Dr. Paul, but Dr. Paul never reviewed the claimant's medical records to confirm the history given by the claimant; (5) the claimant did not depose his primary care doctor; and (6) although the claimant testified that he was experiencing problems and difficulties with breathing at the time of arbitration, this testimony was not corroborated by any medical records or other witnesses. Rather, the most recent medical records "suggest a fairly fit and active retiree who regularly works out at a gym and denied any shortness of breath."

¶ 36    Because the arbitrator found that the claimant had failed to prove that he suffered from a pulmonary condition, the arbitrator also found that the claimant had failed to prove a current condition of ill-being causally connected to his employment or a timely disablement under the Act. Accordingly, the arbitrator denied the claimant's claim for benefits.

¶ 37    The claimant appealed the arbitrator's decision to the Commission, which affirmed the arbitrator's decision in part and reversed in part. The Commission affirmed the arbitrator's finding that the claimant had failed to prove that he suffered from CWP. However, the Commission found that the claimant had proven by a preponderance of the evidence that he had sustained disabling conditions of COPD and chronic bronchitis arising out of or and the course of his employment as

a coal miner.

¶ 38    The Commission found Dr. Paul to be "credible and most persuasive" with regard to these issues. The Commission noted that Dr. Paul is board certified in allergy, asthma and immunology. Although the Commission acknowledged that Dr. Paul is not a B-reader, it recognized Dr. Paul's long history of treating coal miners for coal mine induced lung disease and his equally long history of interpreting chest x-rays of coal miners. The Commission found that Dr. Paul's experience "makes his opinion as credible as one can be without the requisite training that a B-reader possesses."

¶ 39    The Commission was persuaded by Dr. Paul's explanation of his diagnoses of chronic bronchitis and COPD. It noted that, although Dr. Paul initially noted in his report that the claimant's pulmonary function tests were within normal limits, he later testified that, under the AMA Guides to Impairment, Sixth Edition, the claimant's pulmonary function testing results would not be within normal limits; rather, they would be considered mildly abnormal based on the FEV1/FVC ratio. Dr. Paul testified that this indicated an obstructive impairment compatible with chronic bronchitis. Dr. Paul also testified that coal dust can cause chronic bronchitis and chronic bronchitis is one of the things that make up the COPD syndrome. Dr. Paul opined that the coal dust environment to which the claimant was exposed caused his conditions of chronic bronchitis and COPD. Dr. Paul also opined the claimant had significant pulmonary impairment caused by coal dust.

¶ 40    The Commission also relied upon Dr. Paul's testimony that the claimant had coughing and wheezing during upper respiratory infections which would hang on about two months, and that the claimant would get these infections four or five times per year. The Commission credited Dr. Paul's opinion that this amount of coughing (8 to 10 months per year for a number of years) fulfills

the definition of chronic bronchitis. The Commission further noted that, although Dr. Paul did not review the claimant's medical records, the records reflected regular visits and treatments for respiratory infections and for coughs that would, at times, linger. These coughs were sometimes, but not always, productive of sputum. The Commission found that the claimant's medical records were "not dispositive of the claimant's entire medical history" and did not contradict either the history that the claimant provided to Dr. Paul or Dr. Paul's diagnosis of COPD.

¶ 41　　　　The Commission acknowledged that, after reviewing the claimant's medical records, Dr. Castle concluded the claimant did not suffer from any pulmonary disease or impairment occurring as a result of his occupational exposure to coal mine dust. However, the Commission did not find Dr. Castle's testimony to be persuasive. The Commission noted that, although Dr. Castle testified that a cough is not considered an objective determinate of pulmonary impairment, he admitted that this does not mean the presence of a cough is without importance, medically speaking. The Commission also emphasized Dr. Castle's acknowledgement that having pulmonary function test results within the range of normal "does not mean [one's] lungs are free of any long damage, injury or disease." The Commission further noted that Dr. Castle conceded that chronic bronchitis is a diagnosis determined by patient history and that a diagnosis of chronic bronchitis is appropriate where there is evidence of obstruction.

¶ 42　　　　The Commission noted that Dr. Castle was critical of the method Dr. Paul used in his determination of the claimant's FEV1/FVC ratio. Specifically, Dr. Castle opined that Dr. Paul's calculation of the claimant's FEV1/FVC ratio at 74%, which supposedly proved Dr. Paul's theory that the claimant had obstruction, was faulty. However, the Commission found Dr. Paul's testimony that the claimant's FEV1/FVC ratio of 74% proved obstruction to be more persuasive than Dr. Castle's contrary opinion because: (1) Dr. Paul had extensive experience in this area;

- 13 -

(2) Dr. Paul examined the claimant and took his own history, whereas Dr. Castle did not examine the claimant or take a history from him; (3) Dr. Castle did not perform his own pulmonary function tests; and (4) Dr. Castle did not cite any studies to support his assertion that Dr. Paul's method of calculating a FEV1/FVC ratio was incorrect.

¶ 43    The Commission also found that the claimant's testimony of his prior and current medical and physical condition supported Dr. Paul's diagnosis of COPD and chronic bronchitis. The Commission noted that the claimant testified he worked in the coal mine for 40 years with the last 38 being below ground. In addition to coal dust, he was regularly exposed to and breathed silica dust, roof bolting glue fumes, diesel fumes and "trowel on" glue. The claimant further testified that, beginning in the early to mid-1980s, his breathing would become labored or he would cough up black sputum when he would get a cold. The claimant stated that, since he left the mine, his breathing problems "pretty much stayed the same." He testified that he cannot seem to take a deep breath when trying to do yard work or playing with his grandchildren, and his hobbies and activities of daily living are now affected. The claimant testified that his complaints since leaving mining on January 30, 2015, have remained stable. The Commission recognized that, although the claimant's health has remained stable, the ill-effects of his mining career still linger.

¶ 44    Based on all the evidence presented, the Commission found that the claimant's employment as a coal miner exposed him to coal mine dust and other mining substances that resulted in his developing COPD and chronic bronchitis.

¶ 45    The Commission also found that the claimant suffered a permanent partial disability as a result of his employment with the employer. Accordingly, the Commission concluded that an analysis under section 8.1b(b) of the Workers' Compensation Act (820 ILCS 305/8.1b(b) (West 2014)) was warranted, and it applied the factor analysis prescribed by that section. After reviewing

the entire record and evaluating and applying the five factors outlined in section 8.1b(b), the Commission concluded that the claimant's 40-year career as a coal miner introduced him to exposures that resulted in permanent injuries to his pulmonary system. The Commission found that the claimant had suffered a 10% loss of use of a person as a whole under section 8(d)(2) of the Workers' Compensation Act as the result of the January 30, 2015, work-related accident and ordered the employer to pay the claimant PPD benefits pursuant to that section in the amount of $735.37 for a period of 50 weeks.

¶ 46     The employer sought judicial review of the Commission's decision before the circuit court of Williamson County. The circuit court confirmed the Commission's decision.

¶ 47     This appeal followed.

¶ 48                                              ANALYSIS

¶ 49                    1. The Commission's Finding of COPD and Chronic Bronchitis

¶ 50     The employer argues that the Commission's findings that the claimant suffered from the occupational diseases of chronic bronchitis and COPD as a result of his exposure to coal dust and other mining materials were against the manifest weight of the evidence. The claimant in an occupational disease case has the burden of proving both that he suffers from an occupational disease and that a causal connection exists between the disease and his employment. *Freeman United Coal Mining Co. v. Illinois Workers' Compensation Comm'n*, 2013 IL App (5th) 120564WC, ¶ 21; *Anderson v. Industrial Comm'n*, 321 Ill. App. 3d 463, 467 (2001). Whether an employee suffers from an occupational disease and whether there is a causal connection between the disease and the employment are questions of fact. *Freeman United Coal Mining Co.*, 2013 IL App (5th) 120564WC, ¶ 21; *Bernardoni v. Industrial Comm'n*, 362 Ill. App. 3d 582, 597 (2005). It is the function of the Commission to decide questions of fact, judge the credibility of witnesses,

- 15 -

and resolve conflicting medical evidence. *Freeman United Coal Mining Co.*, 2013 IL App (5th) 120564WC, ¶ 21; *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674 (2009). Interpretation of medical testimony is particularly within the province of the Commission. *Freeman United Coal Mining Co. v. Workers' Compensation Comm'n*, 386 Ill. App. 3d 779, 782-83 (2008).

¶ 51   The Commission's determination on a question of fact will not be disturbed on review unless it is against the manifest weight of the evidence. *Bernardoni*, 362 Ill. App. 3d at 597; *Docksteiner v. Industrial Comm'n*, 346 Ill. App. 3d 851, 856-57 (2004). For a finding to be contrary to the manifest weight of the evidence, it must be clearly apparent from the record that an opposite conclusion was the proper result. *Vogel v. Industrial Comm'n*, 354 Ill. App. 3d 780, 786 (2005); see also *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 539 (2007). It is the province of the Commission to weigh the evidence and draw reasonable inferences therefrom in the first instance, and we will not overturn the Commission's findings simply because a different inference could be drawn. *Freeman United Coal Mining Co.*, 386 Ill. App. 3d at 782-83. The test is whether the evidence is sufficient to support the Commission's finding, not whether this court or any other tribunal might reach an opposite conclusion. *Bernardoni*, 362 Ill. App. 3d at 597.

¶ 52   Applying these deferential standards, we cannot conclude the Commission's findings that the claimant suffered from the occupational diseases of chronic bronchitis and COPD and that both of those conditions were causally related to his employment as a coal miner were against the manifest weight of the evidence. After examining the claimant, taking a medical history from the him, and conducting a pulmonary function test, Dr. Paul diagnosed the claimant with COPD and chronic bronchitis and opined that these conditions were causally related to his exposure to coal dust during his employment. Although Dr. Castle disagreed, the Commission was entitled to credit

- 16 -

Dr. Paul's opinions over those of Dr. Castle. It is the Commission's function to judge the credibility of witnesses and to resolve conflicting medical evidence, particularly medical opinion testimony. *Freeman United Coal Mining Co.*, 2013 IL App (5th) 120564WC, ¶ 21; *Hosteny*, 397 Ill. App. 3d at 674. Dr. Paul's testimony provided sufficient evidence to support the Commission's findings.

¶ 53        The employer argues that Dr. Paul's findings of chronic bronchitis and COPD were not credible because: (1) Dr. Paul did not include these diagnoses in his initial report; (2) in his report, Dr. Paul opined that the claimant's pulmonary function testing revealed that his lung function was within normal limits; (3) Dr. Paul did not reexamine the claimant or receive any new patient history or other information that would support his change of opinion and his diagnoses of chronic bronchitis and COPD more than two years after his examination of the claimant; (4) Dr. Paul did not review the claimant's medical records, which contain no diagnosis of chronic bronchitis or COPD; (5) Dr. Paul applied an erroneous methodology when calculating the claimant's FEV1/FVC ratio, and, if he had used the method recommended by the AMA Guide and the American Thoracic Society (ATS) Guidelines, he would have found the claimant's lung function to be within normal limits; (6) neither the claimant's medical records nor the history that the claimant related to Dr. Paul support a diagnosis of chronic bronchitis pursuant to the AMA Guides' or the World Health Organization's (WHO) definition of that condition (*i.e.*, a cough productive of sputum for at least three months out of the year for two consecutive years); and (7) Dr. Paul was the only physician to diagnose the claimant with chronic bronchitis or COPD.

¶ 54        We do not find these arguments to be persuasive. As an initial matter, the fact that Dr. Paul changed his opinion after issuing his initial report is not dispositive. What matters is whether Dr. Paul's subsequent opinion that the claimant suffered from work-related chronic bronchitis and

- 17 -

COPD has some foundation in the evidence and whether it was against the manifest weight of the evidence for the Commission to credit that opinion. Dr. Paul's diagnoses of chronic bronchitis and COPD were amply supported by the evidence. Dr. Paul has extensive experience treating coal miners for coal mine induced lung disease and a long history of interpreting chest x-rays and other diagnostic tests performed on coal miners. Based on that experience, on his examination of the claimant, on the medical history provided by the claimant, and on the claimant's pulmonary function testing, Dr. Paul opined that the amount of coughing reported by the claimant (8 to 10 months per year for a number of years) fulfills the definition of chronic bronchitis. Dr. Paul further opined that chronic bronchitis is one of the things that make up the COPD syndrome, which is an obstructive disorder.

¶ 55 Although Dr. Castle disagreed with these diagnoses, he did not examine the claimant or take a medical history from him. This is particularly important given Dr. Castle's admission that a diagnosis of chronic bronchitis is determined by patient history. Dr. Castle further conceded that a diagnosis of chronic bronchitis is appropriate where there is evidence of obstruction, which Dr. Paul found based on his diagnosis of chronic bronchitis. Dr. Castle further acknowledged that the presence of a cough is not without importance in diagnosing pulmonary impairments.

¶ 56 Moreover, although Dr. Paul did not review the claimant's medical records, the records provided some support for Dr. Paul's diagnoses. The records reflect that the claimant made regular visits and received treatments for respiratory infections and for coughs that would, at times, linger. These coughs were sometimes, but not always, productive of sputum. Further, the medical records do not contradict either the history that the claimant provided to Dr. Paul or Dr. Paul's diagnosis of chronic bronchitis and COPD. As the Commission noted, the medical records do not necessarily reflect the claimant's entire medical history.

¶ 57    The employer also argues that Dr. Paul applied the wrong method in calculating the FEV1/FVC ratio, and the wrong definition of chronic bronchitis. Both of these arguments are predicated on guidelines promulgated by the AMA, the WHO, and the ATS. However, these are merely "guidelines," not binding requirements. Thus, Dr. Paul was not required to follow all aspects of these guidelines in rendering his medical opinions. Rather, he could have reasonably based his diagnoses of chronic bronchitis and COPD on his own medical experience. As the Commission noted, Dr. Paul has extensive experience in this area. Moreover, Dr. Castle did not perform his own pulmonary function tests. Nor did he cite any studies to support his assertion that Dr. Paul's method of calculating a FEV1/FVC ratio was incorrect.

¶ 58    In any event, even assuming *arguendo* that Dr. Paul's calculation of the claimant's FEV1/FVC ratio was erroneous, that fact alone would not be dispositive. The FEV1/FVC ratio measures a patient's lung function, which can be used to diagnose obstructive lung diseases like COPD. However, the evidence suggested that the FEV1/FVC test is not the only way to diagnose obstruction, and Dr. Paul did not base his finding of obstructive lung disease on the FEV1/FVC ratio alone. Moreover, Dr. Castle acknowledged that having pulmonary function test results within the range of normal "does not mean [one's] lungs are free of any long damage, injury or disease."

¶ 59    In addition, the claimant's testimony supported Dr. Paul's diagnosis of chronic bronchitis. The claimant testified that, beginning in the 1980s, his breathing became labored and he would cough up black sputum. From the time he first noticed these breathing problems until he left the mines, his breathing issues have stayed the same and have not gotten any better. At times, they got a little worse. When he would get bronchitis, he could not breathe and he would go to his doctors for treatment. At the time of arbitration, the claimant still suffered from disabling breathing problems. Although he does not take any breathing medications, he cannot seem to take

a deep breath. He has to stop and rest while doing yard work or playing with his grandchildren. He used to be very active in sports, but he has not played any sports for approximately 20 years. He quit bike riding and cannot run anymore. Although he still hunts, he can no longer trek deep into the woods.

¶ 60    Accordingly, Dr. Paul's diagnoses of COPD and chronic bronchitis, and his opinion that these conditions were causally related to his exposure to coal dust during his employment, are not against the manifest weight of the evidence.

¶ 61                    2. Whether the Claimant Established a Timely Disablement

¶ 62    The employer next argues that the Commission erred by implicitly finding that the claimant proved that he suffered disablement within two years after the last day of the last exposure to the hazards of the occupational disease, as required by section 1(f) of the Act. 820 ILCS 310/1(f) (West 2014). Whether a claimant has provided sufficient evidence of disablement is a question of fact for the Commission, and its decision in this regard will not be reversed unless it is against the manifest weight of the evidence. *Freeman United Coal Mining Co.*, 386 Ill. App. 3d at 783-84.

¶ 63    As the employer correctly notes, the Commission implicitly found a timely disablement because it concluded that the claimant had chronic bronchitis and COPD and awarded PPD benefits. In relevant part, section 1(f) provides that "[n]o compensation shall be payable for or on account of any occupational disease unless disablement, as herein defined, occurs within two years after the last day of the last exposure to the hazards of the disease." 820 ILCS 310/1(f) (West 2014). In relevant part, section 1(e) defines "disablement" as "an impairment or partial impairment, temporary or permanent, in the function of the body or any of the members of the body, or the event of becoming disabled from earning full wages at the work in which the employee was engaged when last exposed to the hazards of the occupational disease by the employer from

- 20 -

whom he or she claims compensation." 820 ILCS 310/1(e) (West 2014).

¶ 64    The claimant has proved a timely disablement under sections 1(e) and (f). Dr. Paul, the expert upon whom the Commission relied, diagnosed the claimant with chronic bronchitis and COPD. Dr. Paul concluded that these conditions were caused by the coal dust environment the claimant encountered during his employment. Dr. Paul testified that COPD, by definition, is disabling, and he opined that the claimant's COPD and chronic bronchitis prevented him from returning to work as a coal miner. The claimant's testimony of his impaired functioning corroborated Dr. Paul's finding of disablement. Although Dr. Castle found no impairment or disablement, the Commission was entitled to credit Dr. Paul's opinions over those of Dr. Castle. Moreover, while the employer contends that there was no evidence of disablement, it does not argue in the alternative that the claimant failed to prove that he suffered disablement within two years after the last day of the last exposure to the hazards of the occupational disease. Accordingly, the Commission's implicit finding of disablement was not against the manifest weight of the evidence.[4]

¶ 65                            3. PPD Benefits

¶ 66    The employer also argues that the Commission erred by awarding PPD benefits to the extent of 10% loss of use of a person as a whole. A determination of the extent of a claimant's disability is a question of fact, and the Commission's decision will not be set aside unless it is against the manifest weight of the evidence. *Freeman United Coal Mining Co. v. Industrial*

---

[4]The employer cites *Dawson v. Workers' Compensation Comm'n*, 382 Ill. App. 3d 581 (2008), for the proposition that, in order to prove a disablement in this case, the claimant must establish that "but for his injuries, [he] would have been in full performance of his duties as coal miner." However, *Dawson* is inapposite. *Dawson* involved a wage differential claim under section 8(d)(1), not a claim for PPD benefits under section 8(d)(2), as in this case.

*Comm'n*, 263 Ill. App. 3d 478, 485 (1994); *Hutson v. Industrial Comm'n*, 223 Ill. App. 3d 706 (1992). When conflicting medical testimony is presented, it is for the Commission to determine which testimony is to be accepted. *Freeman United Coal Mining Co.*, 263 Ill. App. 3d at 485; *Hutson*, 223 Ill. App. 3d 706.

¶ 67    Section 8.1b(b) provides that PPD shall be established by: (1) a physician's written report establishing the claimant's level of impairment (820 ILCS 305/8.1b(a) (West 2014)); and (2) consideration of the five factors listed in section 8.1b(b) (820 ILCS 305/8.1b(b) (West 2014)). Those factors are: (i) the reported level of impairment pursuant to subsection (a); (ii) the occupation of the injured employee; (iii) the age of the employee at the time of the injury; (iv) the employee's future earning capacity; and (v) evidence of disability corroborated by the treating medical records. 820 ILCS 305/8.1b(b) (West 2014). No single enumerated factor shall be the sole determinant of disability. *Id.* In determining the level of disability, the relevance and weight of any factors used in addition to the level of impairment as reported by the physician must be explained in a written order. *Id.*

¶ 68    Because it concluded that neither party submitted a physician's impairment rating report or opinion into evidence under section 8.1b(b)(i), the Commission gave no weight to the first factor. With regard to the second factor, the occupation of the employee, the Commission noted that the claimant was retired, but his occupation at the time of exposure was a coal miner. The gave this factor "some weight." As to the third factor, the Commission observed that the claimant was 62 years old at the time he retired, the same date as his last exposure. Given that the claimant was at the end of his career, and he has remained stable, the Commission gave this factor "significant weight." With regard to the fourth factor, which addresses the claimant's future earning capacity, the Commission found that the claimant has not proven that his future earning

- 22 -

capacity will be diminished. The claimant testified that he receives a pension, has a 401k and signed up for Medicare. The record is silent regarding any connection between his condition of ill-being and effect on his future earning capacity. Thus, the Commission assigned "little weight" to this factor. As to the fifth factor, which addresses the extent to which the treating medical records corroborate the claimant's alleged disability, the Commission noted that although the claimant's treating medical records indicate that the claimant's condition has remained stable since he was last in a mine, they also indicate that the claimant's chronic bronchitis, characterized by Dr. Paul as chronic obstructive pulmonary disease, is an ongoing issue. The Commission found this to be indicative of the claimant's disability, and it assigned "moderate weight" to this factor.

¶ 69    Based on this analysis, the Commission concluded that the claimant's 40-year career as a coal miner introduced him to exposures that resulted in permanent injuries to his pulmonary system. Specifically, the Commission found that the claimant had suffered a 10% loss of use of a person as a whole as the result of the January 30, 2015, work-related accident. It ordered the employer to pay the claimant PPD benefits pursuant to sections 8(d)(2) and 8.1b(b) in the amount of $735.37 for a period of 50 weeks.

¶ 70    The employer argues that the Commission's award of PPD benefits was contrary to law because the Commission erroneously found that neither party had submitted a physician's report. In support of this argument, the employer notes that Dr. Castle presented an opinion on impairment during his deposition and argues that the Commission erred by failing to consider this opinion in determining the nature and extent of the claimant's impairment.

¶ 71    This argument fails. Section 8.1b(a), which prescribes the form and content of a physician's report under the statute, provides that such reports must be in writing. The employer does not contend that Dr. Castle submitted a written report. Rather it relies upon a statement Dr.

Castle made during his deposition. That is not sufficient. Moreover, section 8.1b(a) further provides that "[t]he report *shall include* an evaluation of medically defined and professionally appropriate measurements of impairment that *include, but are not limited to: loss of range of motion; loss of strength; measured atrophy of tissue mass consistent with the injury*; and any other measurements that establish the nature and extent of the impairment." (Emphases added.) 820 ILCS 305/8.1b(a) (West 2014). Dr. Castle provided no evaluation or analysis of the factors italicized above. Thus, the Commission did not err by concluding that the employer did not provide a physician's impairment "report."

¶ 72    We agree with the employer that the Commission erred in concluding that the employer did not submit a physician's "opinion" as to impairment. However, "we may affirm the Commission's decision on any basis supported by the record regardless of the Commission's findings or its reasoning." *Dukich v. Illinois Workers' Compensation Comm'n*, 2017 IL App (2d) 160351WC, ¶ 43 n.6; see also *General Motors Corp. v. Industrial Comm'n*, 179 Ill. App. 3d 683, 695 (1989). In other words, we review the result reached by the Commission, not the Commission's reasoning. Accordingly, notwithstanding the Commission's error, the dispositive question is whether there was sufficient evidence in the record to support the Commission's judgment regarding impairment. In this case, there was. Dr. Castle's impairment opinion should not carry as much weight as a written report that meets the requirements of section 8.1b(a). Moreover, there was ample evidence in the record contradicting Dr. Castle's impairment opinion, including the contrary opinion of Dr. Paul (whom the Commission found to be more credible and persuasive than Dr. Castle), the medical records, the claimant's testimony, and the other factors outlined in section 8.1b(b).

¶ 73    The employer also argues that the Commission's finding that the claimant suffered

permanent partial disability to the extent of 10% loss of the person as a whole is against the manifest weight of the evidence. The Commission engaged in a thoughtful and thorough analysis of the remaining four factors enumerated in section 8.1b(b). After reviewing the Commission's analysis, we cannot conclude that a different conclusion was clearly apparent. The employer essentially urges us to reweigh the evidence in order to reach a conclusion opposite of that reached by the Commission. That we cannot, and will not, do.

¶ 74                                CONCLUSION

¶ 75        For the foregoing reasons, we affirm the judgment of the circuit court of Williamson County, which confirmed the Commission's decision.

¶ 76        Affirmed.

2020 IL App (5th) 190522WC
NO. 5-19-0522WC
IN THE
APPELLATE COURT OF ILLINOIS
FIFTH DISTRICT
WORKERS' COMPENSATION COMMISSION DIVISION

_____

| | | |
|---|---|---|
| THE AMERICAN COAL COMPANY, | ) | Appeal from the Circuit Court |
| | ) | of the First Judicial Circuit, |
| Appellant, | ) | Williamson County, Illinois |
| | ) | |
| v. | ) | Appeal No. 5-19-0522WC |
| | ) | Circuit No. 19-MR-148 |
| | ) | |
| THE ILLINOIS WORKERS' | ) | Honorable |
| COMPENSATION COMMISSION *et al.* | ) | Jeffrey A. Goffinet, |
| (Robert Deere, Appellees). | ) | Judge, Presiding. |

_____

**Rule 23 Order Filed:**   October 19, 2020
**Motion to Publish Granted:**   November 16, 2020
**Opinion Filed:**   November 16, 2020

_____

**Justices:**   Honorable William E. Holdridge, P.J.

Honorable Thomas E. Hoffman, J.,
Honorable Donald C. Hudson, J.,
Honorable Peter C. Cavanagh, J., and
Honorable John B. Barberis, J.
Concur

_____

**Attorneys for Appellant**   Kenneth F. Werts, Julie A. Webb, Craig & Craig, LLC, 115 North 7th Street, P.O. Box 1545, Mt. Vernon, IL 62864

_____

**Attorneys for Appellee**   Bruce R. Wissore, Culley & Wissore, 300 Small Street, Suite 3, Harrisburg, IL 62946; Attorney General of Illinois, 100 W. Randolph Street, 12th Floor, Chicago, IL 60601

_____